# KADRMAS ET AL. *v.* DICKINSON PUBLIC SCHOOLS ET AL.

No. 86–7113.   Argued March 30, 1988—Decided June 24, 1988

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, SCALIA, and KENNEDY, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 466. STEVENS, J., filed a dissenting opinion, in which BLACKMUN, J., joined, *post*, p. 472.

*Duane Houdek* argued the cause for appellants. With him on the briefs was *Edward B. Reinhardt, Jr.*

*George T. Dynes* argued the cause and filed a brief for appellees.

*Nicholas J. Spaeth*, Attorney General, argued the cause for the State of North Dakota as *amicus curiae* urging affirmance. With him on the brief was *Laurie J. Loveland*, Assistant Attorney General.*

JUSTICE O'CONNOR delivered the opinion of the Court.

Appellants urge us to hold that the Equal Protection Clause forbids a State to allow some local school boards, but not others, to assess a fee for transporting pupils between their homes and the public schools. Applying well-established equal protection principles, we reject this claim and affirm the constitutionality of the challenged statute.

I

North Dakota is a sparsely populated State, with many people living on isolated farms and ranches. One result has

---

*Briefs of *amici curiae* urging reversal were filed for the American Civil Liberties Union Foundation et al. by *C. Edwin Baker, John A. Powell, Helen Hershkoff, Steven R. Shapiro*, and *Robert Vogel*; and for the Children's Defense Fund et al. by *Julius L. Chambers* and *John Charles Boger*.

*Solicitor General Fried, Assistant Attorney General Reynolds, Deputy Solicitor General Ayer, Deputy Assistant Attorney General Clegg, Paul J. Larkin, Jr.*, and *David K. Flynn* filed a brief for the United States as *amicus curiae* urging affirmance.

been that some children, as late as the mid-20th century, were educated in "the one-room school where, in many cases, there [we]re twenty or more pupils with one teacher attempting in crowded conditions and under other disadvantages to give instructions in all primary grades." *Herman* v. *Medicine Lodge School Dist. No. 8*, 71 N. W. 2d 323, 328 (N.D. 1955). The State has experimented with various ameliorative devices at different times in its history. Beginning in 1907, for example, it has adopted a series of policies that "in certain circumstances required and in other circumstances merely authorized [local public] school districts to participate in transporting or providing compensation for transporting students to school." 402 N. W. 2d 897, 900 (N.D. 1987) (opinion below).

Since 1947, the legislature has authorized and encouraged thinly populated school districts to consolidate or "reorganize" themselves into larger districts so that education can be provided more efficiently. See *Herman, supra*, at 328; N.D. Cent. Code, ch. 15–27.3 (Supp. 1987). Reorganization proposals, which obviously must contemplate an increase in the distance that some children travel to school, are required by law to include provisions for transporting students back and forth from their homes. See § 15–27.3–10. The details of these provisions may vary from district to district, but once a reorganization plan is adopted the transportation provisions can be changed only with the approval of the voters. See §§ 15–27.3–10 and 15–27.3–19.

Appellee Dickinson Public Schools, which serves a relatively populous area, has chosen not to participate in such a reorganization. Until 1973, this school system provided free bus service to students in outlying areas, but the "pickup points" for this service were often at considerable distances from the students' homes. After a plebiscite of the bus users, Dickinson's School Board instituted door-to-door bus service and began charging a fee. During the period relevant to this case, about 13% of the students rode the bus;

their parents were charged $97 per year for one child or $150 per year for two children. 402 N. W. 2d, at 898. Such fees covered approximately 11% of the cost of providing the bus service, and the remainder was provided from state and local tax revenues. *Ibid.*

In 1979, the State enacted the legislation at issue in this case. This statute expressly indicates that nonreorganized school districts, like Dickinson, may charge a fee for transporting students to school; such fees, however, may not exceed the estimated cost to the school district of providing the service. See N. D. Cent. Code § 15–34.2–06.1 (1981 and Supp. 1987). The current version of this provision, which for convenience will be referred to as the "1979 statute," states in full:

> "Charge for bus transportation optional. The school board of any school district which has not been reorganized may charge a fee for schoolbus service provided to anyone riding on buses provided by the school district. For schoolbus service which was started prior to July 1, 1981, the total fees collected may not exceed an amount equal to the difference between the state transportation payment and the state average cost for transportation or the local school district's cost, whichever is the lesser amount. For schoolbus service started on or after July 1, 1981, the total fees collected may not exceed an amount equal to the difference between the state transportation payment and the local school district's cost for transportation during the preceding school year. Any districts that have not previously provided transportation for pupils may establish charges based on costs estimated by the school board during the first year that transportation is provided."

Appellants are a Dickinson schoolchild, Sarita Kadrmas, and her mother, Paula. The Kadrmas family, which also includes Mrs. Kadrmas' husband and two preschool children, lives about 16 miles from Sarita's school. Mr. Kadrmas

works sporadically in the North Dakota oil fields, and the family's annual income at the time of trial was at or near the officially defined poverty level. Until 1985, the Kadrmas family had agreed each year to pay the fee for busing Sarita to school. Having fallen behind on these and other bills, however, the family refused to sign a contract obligating them to pay $97 for the 1985 school year. Accordingly, the school bus no longer stopped for Sarita, and the family arranged to transport her to school privately. The costs they incurred that year for Sarita's transportation exceeded $1,000, or about 10 times the fee charged by the school district for bus service. This arrangement continued until the spring of 1987, when Paula Kadrmas signed a bus service contract for the remainder of the 1986 school year and paid part of the fee. Mrs. Kadrmas later signed another contract for the 1987 school year, and paid about half of the fee for that period.

In September 1985, appellants, along with others who have since withdrawn from the case, filed an action in state court seeking to enjoin appellees—the Dickinson Public Schools and various school district officials—from collecting any fee for the bus service. The action was dismissed on the merits, and an appeal was taken to the Supreme Court of North Dakota. After rejecting a state-law challenge, which is not at issue here, the court considered appellants' claim that the busing fee violates the Equal Protection Clause of the Fourteenth Amendment. The court characterized the 1979 statute as "purely economic legislation," which "must be upheld unless it is patently arbitrary and fails to bear a rational relationship to any legitimate government purpose." 402 N. W. 2d, at 902. The court then concluded "that the charges authorized [by the statute] are rationally related to the legitimate governmental objective of allocating limited resources and that the statute does not discriminate on the basis of wealth so as to violate federal or state equal protection rights." Id., at 903. The court also rejected the contention

that the distinction drawn by the statute between reorganized and nonreorganized school districts violates the Equal Protection Clause. The distinction, the court found, serves the legitimate objective of promoting reorganization "by alleviating parental concerns regarding the cost of student transportation in the reorganized district." *Ibid.* Three justices dissented on state-law grounds. We noted probable jurisdiction, 484 U. S. 813 (1987), and now affirm.

## II

### A

Before addressing the merits, we must consider appellees' suggestion that this appeal should be dismissed on procedural grounds. After the decision of the Supreme Court of North Dakota in this case, Mrs. Kadrmas signed two bus service contracts and made partial payment on each. Since the execution of the first contract on April 6, 1987, Sarita has been riding the bus to school, or as appellees put it, "has been continuously enjoying the benefits of such bus service." Motion to Dismiss 1. Relying on *Fahey* v. *Mallonee*, 332 U. S. 245 (1947), appellees contend that appellants are "estopped" from pursuing their constitutional claims because "[i]t is well established that one may not retain benefits of an act while attacking the constitutionality of the same act." Motion to Dismiss 1–3.

*Fahey* was a shareholders' derivative suit in which a savings and loan association created under an Act of Congress sought to challenge the constitutionality of that same Act. This Court refused to consider the challenge, saying: "It would be difficult to imagine a more appropriate situation in which to apply the doctrine that one who utilizes an Act *to gain advantages of corporate existence* is estopped from questioning the validity of its vital conditions." 332 U. S., at 256 (emphasis added). The case before us today is not analogous. Appellants obviously are not creatures of any statute, and we doubt that plaintiffs are generally forbidden to challenge a statute simply because they are deriving some benefit

from it.   Cf. *United States* v. *San Francisco*, 310 U. S. 16, 28–30 (1940); *Arnett* v. *Kennedy*, 416 U. S. 134, 152–153 (1974) (plurality opinion).   The "benefit" derived by appellants from the challenged statute, moreover, is inapparent. The Dickinson School Board's authority to provide bus transportation is not given by the challenged statute, but by a different provision of state law.   See N. D. Cent. Code § 15–34.2–01 (1981).   Nor does the 1979 statute itself authorize the tax-supported subsidies that make the Dickinson school bus particularly attractive to parents in outlying areas.   The fee that Dickinson is permitted to charge under the 1979 statute is itself a burden rather than a benefit to appellants, and they are not estopped from raising an equal protection challenge to the statute that imposes that burden on them.

Appellees also assert that execution of the bus service contracts rendered this case "moot."   Brief for Appellees 32. Although appellees do not elaborate this contention or distinguish it from the estoppel argument just considered, they may be suggesting the absence of an Article III "case or controversy."   If so, they are mistaken.   Appellants claim that the 1979 statute is unconstitutional to the extent that it authorizes Dickinson to charge a fee for bus service, and they seek to prevent such fees from being collected.   A decision in their favor might relieve them from paying the balance still owing under the two contracts that were executed in 1987, and would certainly relieve them from future assessments for bus service under the authority of the challenged statute. Because Sarita was only nine years old at the time of trial, and because there are two younger children in the family, the ongoing and concrete nature of the controversy between appellants and the Dickinson Public Schools is readily apparent.

### B

Unless a statute provokes "strict judicial scrutiny" because it interferes with a "fundamental right" or discriminates against a "suspect class," it will ordinarily survive an equal

protection attack so long as the challenged classification is rationally related to a legitimate governmental purpose. See, e. g., *San Antonio Independent School Dist.* v. *Rodriguez*, 411 U. S. 1, 16–17 (1973); *Plyler* v. *Doe*, 457 U. S. 202, 216–217 (1982); *Lyng* v. *Automobile Workers*, 485 U. S. 360, 370 (1988). Appellants contend that Dickinson's user fee for bus service unconstitutionally deprives those who cannot afford to pay it of "minimum access to education." See Brief for Appellants i. Sarita Kadrmas, however, continued to attend school during the time that she was denied access to the school bus. Appellants must therefore mean to argue that the busing fee unconstitutionally places a greater obstacle to education in the path of the poor than it does in the path of wealthier families. Alternatively, appellants may mean to suggest that the Equal Protection Clause affirmatively requires government to provide free transportation to school, at least for some class of students that would include Sarita Kadrmas. Under either interpretation of appellants' position, we are evidently being urged to apply a form of strict or "heightened" scrutiny to the North Dakota statute. Doing so would require us to extend the requirements of the Equal Protection Clause beyond the limits recognized in our cases, a step we decline to take.

We have previously rejected the suggestion that statutes having different effects on the wealthy and the poor should on that account alone be subjected to strict equal protection scrutiny. See, e. g., *Harris* v. *McRae*, 448 U. S. 297, 322–323 (1980); *Ortwein* v. *Schwab*, 410 U. S. 656, 660 (1973). Nor have we accepted the proposition that education is a "fundamental right," like equality of the franchise, which should trigger strict scrutiny when government interferes with an individual's access to it. See *Papasan* v. *Allain*, 478 U. S. 265, 284 (1986); *Plyler* v. *Doe, supra*, at 223; *San Antonio Independent School Dist.* v. *Rodriguez, supra*, at 16, 33–36.

Relying primarily on *Plyler* v. *Doe, supra,* however, appellants suggest that North Dakota's 1979 statute should be subjected to "heightened" scrutiny. This standard of review, which is less demanding than "strict scrutiny" but more demanding than the standard rational relation test, has generally been applied only in cases that involved discriminatory classifications based on sex or illegitimacy. See, *e. g., Clark* v. *Jeter,* 486 U. S. 456, 461 (1988); *Mississippi University for Women* v. *Hogan,* 458 U. S. 718, 723–724, and n. 9 (1982); *Mills* v. *Habluetzel,* 456 U. S. 91, 101, and n. 8 (1982); *Craig* v. *Boren,* 429 U. S. 190, 197 (1976). In *Plyler,* which did not fit this pattern, the State of Texas had denied to the children of illegal aliens the free public education that it made available to other residents. Applying a heightened level of equal protection scrutiny, the Court concluded that the State had failed to show that its classification advanced a substantial state interest. 457 U. S., at 217–218, and n. 16, 224, 230. We have not extended this holding beyond the "unique circumstances," *id.,* at 239 (Powell, J., concurring), that provoked its "unique confluence of theories and rationales," *id.,* at 243 (Burger, C. J., dissenting). Nor do we think that the case before us today is governed by the holding in *Plyler.* Unlike the children in that case, Sarita Kadrmas has not been penalized by the government for illegal conduct by her parents. See *id.,* at 220; *id.,* at 238 (Powell, J., concurring). On the contrary, Sarita was denied access to the school bus only because her parents would not agree to pay the same user fee charged to all other families that took advantage of the service. Nor do we see any reason to suppose that this user fee will "promot[e] the creation and perpetuation of a subclass of illiterates within our boundaries, surely adding to the problems and costs of unemployment, welfare, and crime." *Id.,* at 230; see also *id.,* at 239 (Powell, J., concurring). Cf. N. D. Cent. Code § 15–43–11.2 (1981) ("A [school]

board may waive any fee if any pupil or his parent or guardian shall be unable to pay such fees. No pupil's rights or privileges, including the receipt of grades or diplomas, may be denied or abridged for nonpayment of fees"). The case before us does not resemble *Plyler*, and we decline to extend the rationale of that decision to cover this case.

Appellants contend, finally, that whatever label is placed on the standard of review, this case is analogous to decisions in which we have held that government may not withhold certain especially important services from those who are unable to pay for them. Appellants cite *Griffin* v. *Illinois*, 351 U. S. 12 (1956) (right to appellate review of a criminal conviction conditioned on the purchase of a trial transcript); *Smith* v. *Bennett*, 365 U. S. 708 (1961) (application for writ of habeas corpus accepted only when accompanied by a filing fee); *Boddie* v. *Connecticut*, 401 U. S. 371 (1971) (action for dissolution of marriage could be pursued only upon payment of court fees and costs for service of process); *Lindsey* v. *Normet*, 405 U. S. 56 (1972) (appeal from civil judgments in certain landlord-tenant disputes conditioned on the posting of a bond for twice the amount of rent expected to accrue during the appellate process); and *Little* v. *Streater*, 452 U. S. 1 (1981) (fee for blood test in quasi-criminal paternity action brought against the putative father of a child receiving public assistance). See Brief for Appellants 22–23.

Leaving aside other distinctions that might be found between these cases and the one before us today, each involved a rule that barred indigent litigants from using the judicial process in circumstances where they had no alternative to that process. Decisions invalidating such rules are inapposite here. In contrast to the "utter exclusiveness of court access and court remedy," *United States* v. *Kras*, 409 U. S. 434, 445 (1973), North Dakota does not maintain a legal or a practical monopoly on the means of transporting children to

school.  Thus, unlike the complaining parties in all the cases cited by appellants, the Kadrmas family could and did find a private alternative to the public school bus service for which Dickinson charged a fee.  That alternative was more expensive, to be sure, and we have no reason to doubt that genuine hardships were endured by the Kadrmas family when Sarita was denied access to the bus.  Such facts, however, do not imply that the Equal Protection Clause has been violated. In upholding a filing fee for voluntary bankruptcy actions, for example, we observed: "[B]ankruptcy is not the only method available to a debtor for the adjustment of his legal relationship with his creditors. . . . However unrealistic the remedy may be in a particular situation, a debtor, in theory, and often in actuality, may adjust his debts by negotiated agreement with his creditors." *Ibid.*  Similarly, we upheld a statute that required indigents to pay a filing fee for appellate review of adverse welfare benefits decisions.  *Ortwein* v. *Schwab*, 410 U. S. 656 (1973).  Noting that the case did not involve a "suspect classification," we held that the "applicable standard is that of rational justification." *Id.*, at 660.  It is plain that the busing fee in this case more closely resembles the fees that were upheld in *Kras* and *Ortwein* than it resembles the fees that were invalidated in the cases on which appellants rely.  Those cases therefore do not support the suggestion that North Dakota's 1979 statute violates the Equal Protection Clause.*

Applying the appropriate test—under which a statute is upheld if it bears a rational relation to a legitimate govern-

---

*Appellants also suggest that their position is supported by *Bearden* v. *Georgia*, 461 U. S. 660 (1983).  We disagree.  In *Bearden*, we held that a trial court erred "in automatically revoking probation because the [offender] could not pay his fine, without determining that [he] had not made sufficient bona fide efforts to pay or that adequate alternative forms of punishment did not exist." *Id.*, at 662.  Whether this decision is considered under equal protection or due process principles, see *id.*, at 664–667, the criminal-sentencing decision at issue in *Bearden* is not analogous to the user fee at issue in the case before us.

ment objective—we think it is quite clear that a State's decision to allow local school boards the option of charging patrons a user fee for bus service is constitutionally permissible. The Constitution does not require that such service be provided at all, and it is difficult to imagine why choosing to offer the service should entail a constitutional obligation to offer it for free. No one denies that encouraging local school districts to provide school bus service is a legitimate state purpose or that such encouragement would be undermined by a rule requiring that general revenues be used to subsidize an optional service that will benefit a minority of the district's families. It is manifestly rational for the State to refrain from undermining its legitimate objective with such a rule.

## C

Appellants contend that, even without the application of strict or heightened scrutiny, the 1979 statute violates equal protection because it permits user fees for bus service *only* in nonreorganized school districts. This distinction, they say, can be given no rational justification whatsoever. Brief for Appellants 19–22. The principles governing our review of this claim are well established. " 'The Fourteenth Amendment does not prohibit legislation merely because it is special, or limited in its application to a particular geographical or political subdivision of the state.' *Fort Smith Light Co. v. Paving Dist.*, 274 U. S. 387, 391 (1927). Rather, the Equal Protection Clause is offended only if the statute's classification 'rests on grounds wholly irrelevant to the achievement of the State's objective.' *McGowan* v. *Maryland*, 366 U. S. 420, 425 (1961); *Kotch* v. *Board of River Port Pilot Comm'rs*, 330 U. S. 552, 556 (1947)." *Holt Civic Club* v. *Tuscaloosa*, 439 U. S. 60, 71 (1978). Social and economic legislation like the statute at issue in this case, moreover, "carries with it a presumption of rationality that can only be overcome by a clear showing of arbitrariness and irrationality." *Hodel* v. *Indiana*, 452 U. S. 314, 331–332 (1981). "[W]e will not over-

turn such a statute unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational." *Vance* v. *Bradley*, 440 U. S. 93, 97 (1979). In performing this analysis, we are not bound by explanations of the statute's rationality that may be offered by litigants or other courts. Rather, those challenging the legislative judgment must convince us "that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Id.*, at 111.

Applying these principles to the present case, we conclude that appellants have failed to carry the "heavy burden" of demonstrating that the challenged statute is both arbitrary and irrational. *Hodel* v. *Indiana, supra,* at 332. The court below offered the following justification for the distinction drawn between reorganized and nonreorganized districts:

> "The obvious purpose of [statutes treating reorganized and nonreorganized schools differently] is to encourage school district reorganization with a concomitant tax base expansion and an enhanced and more effective school system. The legislation provides incentive for the people to approve school district reorganization by alleviating parental concerns regarding the cost of student transportation in the reorganized district." 402 N. W. 2d, at 903.

Appellees offer a more elaborate, but not incompatible, explanation:

> "[T]he authorization of the bus fee to be charged by districts such as Dickinson has nothing to do with the reorganization of school districts. The reasoning for it is to simply have the few that use the service pay a small portion of that cost in exchange for the substantial benefits received.

"The only reason that the fee authorization was not extended to reorganized districts is that those districts, prior to the passage of the statute permitting fees, were already committed on an individual district basis to some type of transportation system which had been submitted to and approved by the voters in each separate district. To permit the 1979 statute authorizing fees to be retroactively effective in reorganized districts would have been an obvious impairment of existing legal relationships since the already established transportation systems in the various reorganized districts did not include any authority to charge a fee." Brief for Appellees 16.

The State of North Dakota informs us that the 1979 legislation was proposed to the legislature by the Dickinson School District itself, which had for several years been charging transportation fees and which "became concerned when it appeared that the 1979 Legislature would enact a statute prohibiting charging the fee." Brief for State of North Dakota as *Amicus Curiae* 6–7 (citations to legislative history omitted). The State's account of the reason for confining the express authorization of fees to nonreorganized schools districts is the same as the account offered by appellees. *Id.*, at 9.

The explanation offered by appellees and the State is adequate to rebut appellants' contention that the distinction drawn between reorganized and nonreorganized districts is arbitrary and irrational. The Supreme Court of North Dakota has said, and the State agrees, that all reorganized school districts are presently required to furnish or pay for transportation for students living as far away from school as Sarita Kadrmas does. See 402 N. W. 2d, at 903 (citing N. D. Cent. Code § 15–27.3–10 (Supp. 1987)); Tr. of Oral Arg. 32. This requirement, however, is not imposed directly by statute, but rather by the reorganization plans that are statutorily required in the reorganization process. With

certain specified exceptions (not including the transportation provisions), those reorganization plans may be changed by the voters in the affected districts. N. D. Cent. Code § 15–27.3–19 (Supp. 1987). Although it appears that no reorganized district has ever used this mechanism to adopt a user fee like Dickinson's, we have not been informed that such a step could not legally be taken. Thus, the one definitely established difference between reorganized and non-reorganized districts is this: in the latter, local school boards may impose a bus service user fee on their own authority, while the direct approval of the voters would be required in reorganized districts. That difference, however, simply reflects voluntary agreements made during the history of North Dakota's reorganization process, and it could scarcely be thought to make the State's laws arbitrary or irrational.

Even if we assume, as appellants apparently do, that the State has forbidden reorganized school districts to charge user fees for bus service under any circumstances, it is evident that the legislature could conceivably have believed that such a policy would serve the legitimate purpose of fulfilling the reasonable expectations of those residing in districts with free busing arrangements imposed by reorganization plans. Because this purpose could have no application to nonreorganized districts, the legislature could just as rationally conclude that those districts should have the option of imposing user fees on those who take advantage of the service they are offered.

In sum, the statute challenged in this case discriminates against no suspect class and interferes with no fundamental right. Appellants have failed to carry the heavy burden of demonstrating that the statute is arbitrary and irrational. The Supreme Court of North Dakota correctly concluded that the statute does not violate the Equal Protection Clause of the Fourteenth Amendment, and its judgment is

*Affirmed.*

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, dissenting.

In *San Antonio Independent School Dist.* v. *Rodriguez*, 411 U. S. 1 (1973), I wrote that the Court's holding was a "retreat from our historic commitment to equality of educational opportunity and [an] unsupportable acquiescence in a system which deprives children in their earliest years of the chance to reach their full potential." *Id.*, at 71 (dissenting). Today, the Court continues the retreat from the promise of equal educational opportunity by holding that a school district's refusal to allow an indigent child who lives 16 miles from the nearest school to use a school-bus service without paying a fee does not violate the Fourteenth Amendment's Equal Protection Clause. Because I do not believe that this Court should sanction discrimination against the poor with respect to "perhaps the most important function of state and local governments," *Brown* v. *Board of Education*, 347 U. S. 483, 493 (1954), I dissent.

The Court's opinion suggests that this case does not concern state action that discriminates against the poor with regard to the provision of a basic education. The Court notes that the particular governmental action challenged in this case involves the provision of transportation, rather than the provision of educational services. See *ante*, at 459–460, 460–461. Moreover, the Court stresses that the denial of transportation to Sarita Kadrmas did not in fact prevent her from receiving an education; notwithstanding the denial of bus service, Sarita's family ensured that she attended school each day. See *ante*, at 458, 460–461.[1] To the Court, then,

---

[1] The Court therefore does not address the question whether a State constitutionally could deny a child access to a minimally adequate education. In prior cases, this Court explicitly has left open the question whether such a deprivation of access would violate a fundamental constitutional right. See *Papasan* v. *Allain*, 478 U. S. 265, 284 (1986); *San Antonio Independent School Dist.* v. *Rodriguez*, 411 U. S. 1, 25, n. 60, 36–37 (1973). That question remains open today.

this case presents no troublesome questions; indeed, the Court's facile analysis suggests some perplexity as to why this case ever reached this Court.

I believe the Court's approach forgets that the Constitution is concerned with "sophisticated as well as simpleminded modes of discrimination." *Lane* v. *Wilson*, 307 U. S. 268, 275 (1939). This case involves state action that places a special burden on poor families in their pursuit of education. Children living far from school can receive a public education only if they have access to transportation; as the state court noted in this case, "a child must reach the schoolhouse door as a prerequisite to receiving the educational opportunity offered therein." 402 N. W. 2d 897, 901 (N.D. 1987). Indeed, for children in Sarita's position, imposing a fee for transportation is no different in practical effect from imposing a fee directly for education. Moreover, the fee involved in this case discriminated against Sarita's family because it necessarily fell more heavily upon the poor than upon wealthier members of the community.[2] Cf. *Bullock* v. *Carter*, 405 U. S. 134, 144 (1972) (voting system based on flat fees "falls with unequal weight on voters, as well as candidates, according to their economic status"); *Griffin* v. *Illinois*, 351 U. S. 12, 17, n. 11 (1956) (opinion of Black, J.) (state law imposing flat fee for trial transcript is "nondiscriminatory on its face," but "grossly discriminatory in its operation"). This case therefore presents the question whether a State may discriminate against the poor in providing access to education. I regard this question as one of great urgency.

As I have stated on prior occasions, proper analysis of equal protection claims depends less on choosing the "formal label" under which the claim should be reviewed than upon identifying and carefully analyzing the real interests at stake.

---

[2] There is no dispute that the Kadrmas family was indigent at the time relevant to this litigation. The family's annual income at the time of trial was at or near the poverty line. In addition, the family was heavily in debt, owing a total of $13,000.

*Cleburne* v. *Cleburne Living Center, Inc.,* 473 U. S. 432, 478 (1985) (MARSHALL, J., dissenting); see *Selective Service System* v. *Minnesota Public Interest Research Group,* 468 U. S. 841, 876 (1984) (MARSHALL, J., dissenting). In particular, the Court should focus on "the character of the classification in question, the relative importance to individuals in the class discriminated against of the governmental benefits that they do not receive, and the asserted state interests in support of the classification." *Dandridge* v. *Williams,* 397 U. S. 471, 521 (1970) (MARSHALL, J., dissenting); see *San Antonio Independent School Dist.* v. *Rodriguez, supra,* at 98–99 (MARSHALL, J., dissenting). Viewed from this perspective, the discrimination inherent in the North Dakota statute fails to satisfy the dictates of the Equal Protection Clause.

The North Dakota statute discriminates on the basis of economic status. This Court has determined that classifications based on wealth are not automatically suspect. See, *e. g., Maher* v. *Roe,* 432 U. S. 464, 470–471 (1977). Such classifications, however, have a measure of special constitutional significance. See, *e. g., McDonald* v. *Board of Election Comm'rs of Chicago,* 394 U. S. 802, 807 (1969) ("[A] careful examination on our part is especially warranted where lines are drawn on the basis of wealth . . ."); *Harper* v. *Virginia Bd. of Elections,* 383 U. S. 663, 668 (1966) ("Lines drawn on the basis of wealth or property . . . are traditionally disfavored"). This Court repeatedly has invalidated statutes, on their face or as applied, that discriminated against the poor. See, *e. g., Little* v. *Streater,* 452 U. S. 1 (1981); *Bullock* v. *Carter, supra; Harper* v. *Virginia Bd. of Elections, supra; Griffin* v. *Illinois, supra.* The Court has proved most likely to take such action when the laws in question interfered with the access of the poor to the political and judicial processes. One source of these decisions, in my view, is a deep distrust of policies that specially burden the access of disadvantaged persons to the governmental institutions and processes that offer members of our society an

opportunity to improve their status and better their lives. The intent of the Fourteenth Amendment was to abolish caste legislation. See *Plyler* v. *Doe*, 457 U. S. 202, 213 (1982). When state action has the predictable tendency to entrap the poor and create a permanent underclass, that intent is frustrated. See *id.*, at 234 (BLACKMUN, J., concurring). Thus, to the extent that a law places discriminatory barriers between indigents and the basic tools and opportunities that might enable them to rise, exacting scrutiny should be applied.

The statute at issue here burdens a poor person's interest in an education. The extraordinary nature of this interest cannot be denied. This Court's most famous statement on the subject is contained in *Brown* v. *Board of Education*, 347 U. S., at 493:

> "[E]ducation is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education."

Since *Brown*, we frequently have called attention to the vital role of education in our society. We have noted that "education is necessary to prepare citizens to participate effectively and intelligently in our open political system . . . ." *Wisconsin* v. *Yoder*, 406 U. S. 205, 221 (1972); see *San Antonio Independent School Dist.* v. *Rodriguez*, 411 U. S., at 112–115 (MARSHALL, J., dissenting). We also have recognized that

education prepares individuals to become self-reliant participants in our economy. See *Plyler* v. *Doe, supra,* at 221–222; *Wisconsin* v. *Yoder, supra,* at 221. A statute that erects special obstacles to education in the path of the poor naturally tends to consign such persons to their current disadvantaged status. By denying equal opportunity to exactly those who need it most, the law not only militates against the ability of each poor child to advance herself or himself, but also increases the likelihood of the creation of a discrete and permanent underclass. Such a statute is difficult to reconcile with the framework of equality embodied in the Equal Protection Clause.

This Court's decision in *Plyler* v. *Doe, supra,* supports these propositions. The Court in *Plyler* upheld the right of the children of illegal aliens to receive the free public education that the State of Texas made available to other residents. The Court in that case engaged in some discussion of alienage, a classification not relevant here. The decision, however, did not rest upon this basis. Rather, the Court made clear that the infirmity of the Texas law stemmed from its differential treatment of a discrete and disadvantaged group of children with respect to the provision of education. The Court stated that education is not "merely some governmental 'benefit' indistinguishable from other forms of social welfare legislation." *Id.,* at 221. The Court further commented that the state law "poses an affront to one of the goals of the Equal Protection Clause: the abolition of governmental barriers presenting unreasonable obstacles to advancement on the basis of individual merit." *Id.,* at 221–222. Finally, the Court called attention to the tendency of the Texas law to create a distinct underclass of impoverished illiterates who would be unable to participate in and contribute to society. See *id.,* at 222–224. The *Plyler* Court's reasoning is fully applicable here. As in *Plyler,* the State in this case has acted to burden the educational opportunities of a

disadvantaged group of children, who need an education to become full participants in society.

The State's rationale for this policy is based entirely on fiscal considerations. The State has allowed Dickinson and certain other school districts to charge a nonwaivable flat fee for bus service so that these districts may recoup part of the costs of the service. The money that Dickinson collects from applying the busing fee to indigent families, however, represents a minuscule proportion of the costs of the bus service. As the Court notes, *ante*, at 454, all of the fees collected by Dickinson amount to only 11% of the cost of providing the bus service, and the fees collected from poor families represent a small fraction of the total fees. Exempting indigent families from the busing fee therefore would not require Dickinson to make any significant adjustments in either the operation or the funding of the bus service. Indeed, as the Court states, most school districts in the State provide full bus service without charging any fees at all. See *ante*, at 465. The state interest involved in this case is therefore insubstantial; it does not begin to justify the discrimination challenged here.

The Court's decision to the contrary "demonstrates once again a 'callous indifference to the realities of life for the poor.'" *Selective Service System v. Minnesota Public Interest Research Group*, 468 U. S., at 876 (MARSHALL, J., dissenting), quoting *Flagg Bros., Inc. v. Brooks*, 436 U. S. 149, 166 (1978) (MARSHALL, J., dissenting). These realities may not always be obvious from the Court's vantage point, but the Court fails in its constitutional duties when it refuses, as it does today, to make even the effort to see. For the poor, education is often the only route by which to become full participants in our society. In allowing a State to burden the access of poor persons to an education, the Court denies equal opportunity and discourages hope. I do not believe the Equal Protection Clause countenances such a result. I therefore dissent.

472

JUSTICE STEVENS, with whom JUSTICE BLACKMUN joins, dissenting.

When the sovereign applies different rules to different segments of its jurisdiction, it must have a rational basis for doing so. "The term 'rational,' of course, includes a requirement that an impartial lawmaker could logically believe that the classification would serve a legitimate public purpose that transcends the harm to the members of the disadvantaged class." *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U. S. 432, 452 (1985) (STEVENS, J., concurring) (footnote omitted). In this case, JUSTICE MARSHALL accurately explicates the harm to certain members of the disadvantaged class. And since the Supreme Court of the State of North Dakota has unequivocally identified the actual purpose of the geographic discrimination, I would not second-guess that conclusion and presume that the harm JUSTICE MARSHALL describes has been imposed for other reasons.

The State Supreme Court explained:

> "The obvious purpose of such legislation is to encourage school district reorganization with a concomitant tax base expansion and an enhanced and more effective school system. The legislation provides incentive for the people to approve school district reorganization by alleviating parental concerns regarding the cost of student transportation in the reorganized district." 402 N. W. 2d 897, 903 (1987).

This explanation of the state legislative purpose makes two propositions perfectly clear. First, free bus transportation is an important component of public education in a sparsely populated State; otherwise the alleviation of parental concerns regarding the cost of student transportation in a reorganized district could not have been expected to motivate a significant number of voters. Second, after the voters in a school district have had a fair opportunity to decide whether

or not to reorganize,* there is no longer any justification at all for allowing the nonreorganized districts to place an obstacle in the paths of poor children seeking an education in some parts of the State that has been removed in other parts of the State. Cf. *G. D. Searle & Co.* v. *Cohn,* 455 U. S. 404, 420 (1982) (STEVENS, J., dissenting) ("[T]he Constitution requires a rational basis for the special burden imposed on the disfavored class as well as a reason for treating that class differently").

Thus, the State Supreme Court's explanation of the purpose of this discrimination does not include the "elements of legitimacy and neutrality that must always characterize the performance of the sovereign's duty to govern impartially." *Cleburne, supra,* at 452 (footnote omitted). Accordingly, I respectfully dissent.

---

*As the majority recognizes, the North Dakota Legislature has encouraged reorganization since 1947. See *ante,* at 453.