ASSOCIATION OF RESIDENTIAL RESOURCES IN MINNESOTA, INC.; Christian Concerns, Inc.; Hiawatha Homes, Inc.; MTAI Gladson; Portland Residence, Inc.; Rainbow Residences; REM–Buffalo, Inc.; St. Camillus Place; St. Stephen Group Home; Woodvale Dodge Center; Earl English by Violet Burke, his mother and guardian; Sharon Jones by Richard Jones, her father and guardian; Mark Pearson by Pat and G. William Pearson, his parents and next friends; Joseph Trepanier by Charles E. and Helen Trepanier, his parents and guardians; Kelly Kvenlog; Katherine Maiden; Barbara Miller; Thomas Kreiner; and Linda Woroel

v.

Maria GOMEZ, Commissioner of the Minnesota Department of Human Services; and Ann Wynia, individually.

No. 4–92–CV–116.

United States District Court, D. Minnesota, Fourth Division.

Feb. 14, 1994.

Gregory R. Merz, Thomas Steven Darling, Gray, Plant, Mooty, Mooty & Bennett, Minneapolis, MN, for Association of Residential Resources in Minn., Inc., Christian Concerns, Inc., Hiawatha Homes, Inc., MTAI Gladson, Rainbow Residences, Rem–Buffalo, Inc., St. Camillus Place, St. Stephen Group Home, Woodvale Dodge Center, Sharon Jones, Mark Pearson, Joseph Trepanier, Kelly Kvenlog, Katherine Maiden, Barbara Miller, Thomas Kreiner, Linda Woroel.

Stephen B. Young, Mahoney & Hagberg, Minneapolis, MN, for Portland Residence, Inc., Earl English.

John Lawrence Kirwin, Cheryl, Widder, Heilman, Julie Kay Harris, Atty. Gen., St. Paul, MN, for Anne Wynia.

## ORDER

ROSENBAUM, District Judge.

In this case, the Court is asked to determine whether the United States Constitution requires a state-administered Medicaid program to equalize the compensation of health care workers employed in privately-operated facilities, with wages paid in Minnesota's state-operated facilities. The Court finds

that such a compensation scheme is not constitutionally required.

This matter is before the Court on cross-motions for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed.R.Civ.P."). The Court heard oral argument on September 24, 1993. Upon consideration of the files, records, and proceedings herein, and for the reasons set forth below, defendant Maria Gomez's motion for summary judgment is granted; plaintiffs' motion for summary judgment is denied.

Plaintiffs filed this action on December 12, 1990, claiming violations of Title XIX of the Social Security Act (commonly known as the Medicaid Act), 42 U.S.C. §§ 1396 *et seq.*, and 42 U.S.C. § 1983. The plaintiffs seek injunctive and declaratory relief, pursuant to 28 U.S.C. §§ 2201 and 2202, Fed.R.Civ.P. 57, and 42 U.S.C. § 1983, together with attorneys' fees and costs. The complaint alleges that the defendants, as Commissioners of the Minnesota Department of Human Services, violated the Medicaid Act, its implementing regulations, and the United States Constitution.[1] The plaintiffs amended their complaint on April 15, 1991. On October 21, 1992, the Court dismissed, with prejudice, Counts I through VI and Count X of the Amended Complaint, pursuant to the parties' stipulation.

The remaining Counts, VII through IX, are the subject of the cross-motions for summary judgment presently before the Court. The Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331.

---

1. The complaint specifically alleges violations of 42 U.S.C. §§ 1396a(a)(13)(A) and 1396a(a)(19); 42 C.F.R. §§ 447.253(c), 447.202, 447.201(b), and 447.252(b); Minn.Stat. § 256B.501; and the Due Process and Equal Protection clauses of the Fourteenth Amendment of the United States Constitution.

2. ARRM is an association of private institutions that provide residential care to persons with developmental disabilities, including mental retardation and related conditions.

3. The term "intermediate care facility for the mentally retarded" derives from the federal Medicaid statute, 42 U.S.C. §§ 1396 *et seq.* (1992). *See id.* at § 1396d(d). Private ICFs/MR refer to non-state-operated residential facilities that provide health or rehabilitative services for persons with developmental disabilities. *Id.*

## I. Background

### A. Parties

Plaintiffs are the Association of Residential Resources in Minnesota ("ARRM"),[2] nine privately-operated community "intermediate care facilities for the mentally retarded" ("private ICFs/MR or facility-plaintiffs"),[3] five employees of private ICFs/MR, and four individual residents of private ICFs/MR. Defendants are Maria Gomez ("Gomez"), in her official capacity as the Commissioner of the Minnesota Department of Human Services ("DHS"), and Ann Wynia ("Wynia"), in her individual capacity.[4] Ms. Wynia was Commissioner of the DHS prior to Ms. Gomez.[5] Ms. Gomez is the only defendant moving for summary judgment.

### B. Minnesota's Medicaid Plan and Rule 53

Plaintiffs challenge that portion of Minnesota's administrative scheme which implements Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.* Before addressing the specifics of the complaint, it is useful to provide a brief overview of the scheme.

Title XIX of the Social Security Act provides for a federal Medicaid program to assist states in furnishing medical and related services. In order to receive funding under the federal Medicaid statute, Minnesota has established its own state Medicaid plan. *See* 42 U.S.C. § 1396a (1992); Minn.Stat.

---

4. Pursuant to stipulation, the Court previously dismissed the claims of all but two of the plaintiffs against defendant Wynia.

5. The complaint originally named Wynia as the sole defendant. She was sued both individually, and in her official capacity. During the pendency of this action, Natalie Steffen, Wynia's successor as the new Commissioner of the DHS, was substituted as a party to this action, pursuant to Fed.R.Civ.P. 25(d)(1). Ms. Gomez has since succeeded Natalie Steffen in office, and is, therefore, substituted as a party to this action, in her official capacity, in accordance with the rule. Ms. Wynia remains a defendant in her individual capacity.

§ 256B.01 (1992). The plan is jointly funded by the state and federal governments. *See* 42 U.S.C. §§ 1396 *et seq.* (1992). In accord with state and federal regulations, Minnesota's Medicaid plan is administered by the DHS. *See id. See also* Minn.Stat. § 256B.04 (1992); Minn.R. 9525.0015 *et seq.* (1991).

Medicaid recipients do not receive direct cash assistance. Instead, Medicaid pays the medical professionals and institutions that provide services to eligible recipients. In Minnesota, eligible recipient services are provided by both state and private entities. The State provides these services in institutional settings, such as Regional Treatment Centers ("RTCs"), and community placements, such as state-operated community ICFs/MR services ("SOCS"). Private providers offer services in private community ICFs/MR. Under federal law, each state establishes its own plan to reimburse state and private institutions for the cost of providing care to Medicaid recipients. *See* 42 U.S.C. § 1396a(a)(13)(A) (1992). The rates at which these providers are compensated are established by each state.

Commencing in 1971, Minnesota elected to include ICFs/MR as part of its state Medicaid plan. *See* Stipulation of the Parties ("Stip.") ¶ 37. Thereafter, Title XIX Medicaid funds could be used to fund institutional and community-based residential services for persons with developmental disabilities. *See* 42 U.S.C. §§ 1396a(a)(10)(A) and 1396d(a)(15) (1992); Minn.Stat. § 256B.0625, subd. 2 (1992).

Once Medicaid funding became available for ICFs/MR services in the 1970s, more than 30 private ICFs/MR were founded each year. By the early 1980s, Minnesota was the nation's highest per capita consumer of private community ICFs/MR. Stip. ¶ 40. A 1983 report by the Governor's Planning Council on Developmental Disabilities suggested that Minnesota may have overemphasized these facilities, and underutilized other, less restrictive, and less expensive, community service options. Stip. ¶ 41.

Also in 1983, the Legislative Auditor issued a report evaluating Minnesota's use of ICFs/MR and its medical assistance rate-setting system. *See Evaluation of Community Residential Programs for Mentally Retarded,* Office of the Legislative Auditor (Feb. 11, 1983). In that report, the Legislative Auditor proposed that the State increase the availability and use of alternatives to ICFs/MR, and limit the development of all new ICFs/MR. *Id.* at 77–78. Accordingly, in that same year, the Minnesota legislature placed a moratorium on new construction and expansion of ICFs/MR beds. Stip. ¶ 43. The legislature also directed DHS to reduce the combined number of beds in RTCs and ICFs/MR. These actions were taken to further the State's application for a Home and Community–Based Waiver, or "waivered services," another Medicaid option.[6] *See id.;* 42 U.S.C. § 1396n (1992); Minn.Stat. § 256B.092, subd. 5 (1992).

In 1985, in response to a legislative directive, the Commissioner of DHS established a new rate-setting system to recompense private community ICFs/MR for Medicaid services. Stip. ¶ 63–64. *See* Minn. Rules pt. 9553.0010–.0080 (1991). This new system is called Rule 53. The employee compensation levels that result from Rule 53 underlie this lawsuit.

Rule 53 was enacted to control the costs of private ICFs/MR care in Minnesota. Under Rule 53, the State provides funds to private ICFs/MR for services and costs, including compensation for direct care staff,[7] based on a facility's historic cost of providing those services. A provider's operating costs for a particular "rate year" are based on the allowable costs[8] from a previous cost-reporting

---

**6.** Waivered services provide funding for residential or community-based placements so that recipients may avoid placement in state-operated RTCs or private ICFs/MR. In 1984, Minnesota was granted a waiver by the federal government. *See* Stip. ¶¶ 44–45.

**7.** Direct care staff are those employees of a residential facility who train or supervise residents in activities of daily living, and help to implement residents' individual program plans and goals. *See generally* Minn.Rules pt. 9525.0225, subd. 11 (1991).

**8.** The DHS sometimes disallows costs determined to be unreasonable or unnecessary. *See* Minn.Rules pt. 9553.0035, subp. 6.B. and 15.B.

year, increased by an indexed inflation factor based on the Consumer Price Index. Stip. ¶ 67. *See* Minn.Stat. § 256B.501, subd. 3 (1992). Under Rule 53, increases in providers' costs are not reflected in the State's reimbursement rates until approximately 21 months after those costs are incurred. This 21–month lag between cost increases, and the time those increases are reflected in the State's payment rate, is a principal cost containment measure of Rule 53. Stip. ¶ 69.

Unlike the private ICFs/MR, Medicaid payment rates for state-operated RTCs and SOCS are not mandated by Rule 53, nor is there a DHS rule governing Medicaid expenditures and reimbursement rates for RTCs and SOCS. Stip. ¶ 72. Rather, the state facility rates are based on each institution's actual costs. Moreover, the State reimburses itself, in full, for the cost of operating the ICFs/MR portions of its RTCs and SOCS to the extent allowable under federal law.

The interplay between the State's direct funding of its own facilities, and the effect of Rule 53 on the private sector, has maintained and increased the difference between levels of direct care staff compensation in state-operated RTCs and SOCS and private ICFs/MR. From the beginning, private ICFs/MR have paid their direct care staff less than the State pays its own direct care employees. This disparity exists nationwide, and has been the subject of numerous state and national studies. Stip. ¶¶ 78, 88, 118, 127. The parties do not dispute that Rule 53 has limited the ability of private ICFs/MR to close the wage gap.

## II. *Analysis*

### A. *Standard for Summary Judgment*

■ Summary judgment is appropriate where there is no dispute of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). *See also Hartnagel v. Norman*, 953 F.2d 394, 395–96 (8th Cir.1992). The question is whether factual issues exist which may be reasonably resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

There being no substantial dispute as to the facts,[9] this case turns on a pure question of law: Does equal protection mandate equal pay for direct care employees in state-operated and privately-operated ICFs/MR? Plaintiffs and defendant Gomez seek summary judgment on the basis of rationality review under the Equal Protection Clause of the Fourteenth Amendment.

### B. *Equal Protection Analysis*

■ The Fourteenth Amendment provides that "[n]o state shall ... deprive any person of life, liberty, or property, without due process of law; nor deny to any person ... the equal protection of the laws." It is axiomatic that equal protection requires that " 'all persons similarly circumstanced shall be treated alike.' " *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982), citing *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 562, 64 L.Ed. 989 (1920). "The initial discretion to determine what is 'different' and what is 'the same' resides with [each State's legislature]." *Id.* A legislature must be permitted substantial latitude to establish classifications that "roughly approximate the nature of the problem perceived, that accommodate competing concerns both public and private, and that account for limitations on the practical ability of the State to remedy every ill." *Id.*

■ Classifications that neither involve fundamental rights, nor proceed along suspect lines, are accorded a strong presumption of validity if there is "any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Communications, Inc.*, 508 U.S. ——, ——, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993). *See also Kadrmas v. Dickinson Public Schools*, 487 U.S. 450, 462, 108 S.Ct. 2481, 2490, 101 L.Ed.2d 399 (1988). Moreover, a state legislature need not "actually articulate

---

(1991). There is no question concerning the allowance/disallowance procedure before the Court in this case.

9. *See* Stipulation of the Parties.

at any time the purpose or rationale supporting its classification." *Nordlinger v. Hahn,* 505 U.S. ——, ——, 112 S.Ct. 2326, 2334, 120 L.Ed.2d 1 (1992). " 'The burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.' " *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 364, 93 S.Ct. 1001, 1006, 35 L.Ed.2d 351 (1973), citing *Madden v. Kentucky,* 309 U.S. 83, 60 S.Ct. 406, 84 L.Ed. 590 (1940). The Court, of course, recognizes that equal protection "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Beach Communications,* 508 U.S. at —— - ——, 113 S.Ct. at 2100–2101. *See also Heller v. Doe,* —— U.S. ——, ——, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257 (1993).

Plaintiffs assert that direct care employees of state facilities and those at private ICFs/MR are similarly situated. They also contend that the fact that Rule 53 was principally enacted to contain costs of ICFs/MR in Minnesota is not a legitimate basis alone upon which to treat similarly situated employees differently. Defendants respond that: (1) direct care staff at state facilities and those at private ICFs/MR are not similarly situated, and, therefore, may lawfully be treated differently; and (2) a rational relationship exists between the classification at issue—here the application of Rule 53 to private ICFs/MR, but not to RTCs and SOCS—and a legitimate state interest.

■ The question before the Court, then, devolves into an analysis of whether the differently compensated persons in this case are or are not "similarly circumstanced," and whether there exists a rational relationship between the challenged classification and a legitimate state interest. The Court finds that direct care staff of state facilities and private ICFs/MR are not similarly situated, and there exists a rational basis for the classification which the Minnesota legislature

could have perceived, even if this basis is not explicitly set forth in the legislation.

1. *Similarly Situated*

■ Although direct care staff at state-operated RTCs and SOCS and those at private ICFs/MR, have similar job responsibilities—training and/or supervising residents in activities of daily living, and helping to implement individual program plans and goals— the Court finds that the collective bargaining unit employees of the Minnesota state hospital system, and the health care workers employed by private entities from which the State of Minnesota purchases a similar service are not similarly situated. In this Court's view, the simple fact that two persons have the same job description does not necessarily mean that they are similarly situated for equal protection purposes.

While it is true that direct care employees at both state and private facilities perform essentially the same function, and federal law, itself, categorizes both types of facilities as ICFs/MR, *see* 42 C.F.R. § 440.150 (1992), differences in management style, wage negotiation and determination, funding, and clientele demonstrate that these employees are not similarly circumstanced. Unlike private ICFs/MR, RTCs must accept court-committed persons who cannot be served in other placements. Stip. ¶¶ 52–53. In contrast, private ICFs/MR have the option of refusing to serve such clientele. As a result, direct care staff at state and private facilities face different challenges in providing care to their respective residents.

In addition, unlike most direct care staff of private ICFs/MR, direct care employees of state facilities have long been unionized.[10] The factor of collective bargaining implicates differing compensation schemes and requires different management techniques. These are factors which the State must consider in negotiating and setting wages.[11] Further, as

---

10. The Court notes that the direct care staff of one of the facility-plaintiffs is unionized. Interestingly, the wages of these workers, who are covered by a collective bargaining agreement, are comparable to those of their counterparts in RTCs and SOCS. *See* Stip. ¶ 106.

11. To the contrary, and as *dicta,* the Court posits that if the State, tomorrow, were to declare that it would pay newly-hired direct care staff in state-operated facilities at a lower rate of compensation than is paid to present direct care employees, there may well be a different analysis. Such new hires, in the same facilities, would

discussed in section II.B., RTCs and SOCS are funded by a different method from that used for private ICFs/MR. The State funds RTCs and SOCS directly through State appropriations. Private ICFs/MR secure their own funding, and are later recompensed by the State for eligible services. These differences in compensation and funding breed other differences in management and organization, which render direct care employees in state-operated RTCs and SOCS, and those in private ICFs/MR, not similarly situated.

There are numerous situations where a state both directly provides a service, and separately purchases that same service from individuals or companies that contract with the State. For example, the State of Minnesota employs counsel through the Office of the Attorney General. When that office is unable to provide legal services, the State may privately contract for outside legal services. In such a case, the privately-obtained services may well be *more* expensive than counsel furnished by the State. Equal protection and rational basis analysis would not, in the Court's view, require that Minnesota's deputy attorneys general be compensated at the level of the State's private counsel, nor, conversely, would the retained counsel be required to provide their services at the lesser rates paid to the State employees. One can readily imagine similar situations in which the State maintains its own staff of service providers, but also purchases the same service in the private sector. Such examples range from road repair and maintenance, to snow plowing, to transportation services.

### 2. *Relationship to State Interest*

The defendants advance numerous reasons why the State of Minnesota, through DHS, may have decided that it was necessary to treat private ICFs/MR differently from state-run RTCs and SOCS. First, the defendants contend that the State has a heightened interest in the terms and conditions of its own employees. This asserted interest is allegedly accentuated by the fact that wages

of state employees are set by collective bargaining. Second, defendants argue that the legislature may have believed that the costs of private ICFs/MR are of greater concern as the use of private facilities expand, and state-operated facilities contract.[12] Third, defendants claim that the State's interest in controlling costs requires different actions for state and private providers because of their different wage-setting and operating systems. Finally, defendants claim that state direct care employees face different challenges, and work under different conditions, than those confronted by direct care employees in private ICFs/MR.

Plaintiffs respond that defendants may not use cost alone as a justification for treating private and state ICFs/MR, and ultimately their direct care staffs, differently. According to plaintiffs, "[i]n order to be rationally related to a legitimate state purpose, any classification limiting the availability of public funds must be consistent with the purposes for which such funds are available—here, the provision of medical services, particularly residential care services, to needy individuals." (Plaintiffs' Memorandum in Support of Motion for Summary Judgment, p. 15.)

The Court finds that, while it is not expressly articulated in the legislation, there exists a rational basis upon which the legislature could have determined that differential treatment of private and state ICFs/MR was warranted. At the time that Rule 53 was promulgated, the number of private ICFs/MR were increasing dramatically. This marked proliferation of private ICFs/MR may have led the legislature to conclude that a more immediate cost containment mechanism was necessary to control private ICFs/MR costs, and, thereby, allocate scarce resources more efficiently. It is clear that the legislature has attempted to control costs of its own state-run RTCs and SOCS by decreasing the size and number of state-operated facilities. The Court finds that the legislature could well have perceived that the anticipated increase in the use of

---

likely be similarly situated vis-a-vis their colleagues for equal protection purposes.

12. Since as early as the 1960s and 1970s, the State has steadily decreased the number of residents in RTCs and the number of RTC facilities.

private ICFs/MR at the time that Rule 53 was enacted called for a comprehensive financing framework for this new and increasing category of care provider. These new facilities would be funded and regulated differently from the method used in the state-owned and operated facilities.

■ The Court finds that this would be a rational basis upon which to differentiate between private and public ICFs/MR, so as to allocate state resources more efficiently. A state may address similar problems differently, or deal with one problem while ignoring another. *City of New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976).

Rule 53, and the DHS program of which it is a part, grows out of an extended history. For many years, the State of Minnesota maintained an extended network of facilities for the care and maintenance of its mentally retarded citizens. The State entered into a series of collective bargaining agreements with the unionized employees of those facilities. As a partial outgrowth of these collective bargaining agreements, the costs of care for the state-run ICFs/MR rose faster than rates that were paid in the private sector. The State wisely secured these services from private providers. However, prior to the adoption of Rule 53, even the private sector began to raise its own costs to a level the State could no longer afford. To deal with this problem, the State reined in private ICFs/MR costs through Rule 53, and simultaneously reduced its own state-run facility costs by decreasing the size and number of RTCs. The law does not prohibit these actions.[13]

Simple protection of the public fisc is not a rational basis for imposition of a dollar disparity. But no such reason is advanced here. The reality is that the State has priced itself out of a market, even though it maintains a decreasing section of that market by operating its own facilities. The State has found the means and the ability to purchase these essential services at a reasonable price,

while, at the same time, allocating state resources more efficiently. Neither equal protection theory, nor this Court, will bar this perfectly rational, legally permissible, and economically viable solution.

Accordingly, for the reasons set forth above, and based upon the files, records, and proceedings herein, IT IS ORDERED THAT: Plaintiffs' motion for summary judgment is denied. Defendant Gomez's motion for summary judgment is granted.

LET JUDGMENT BE ENTERED ACCORDINGLY.

---

**13.** Moreover, the Court would be similarly disinclined to remedy the claimed compensation disparity by reducing the pay of the state employees to the average level of compensation for ICF/MR

caregivers in the private sector. If this were a case of unequal protection, presumably this solution would be as constitutionally permissible as the remedy sought by the plaintiffs.