**Lydia GOULART and Kyle Travers Plaintiffs**

v.

**Paul D. MEADOWS & Board of County Commissioners of Calvert County Defendants**

**No. CIV.PJM 00–286.**

United States District Court, D. Maryland.

Aug. 20, 2002.

David E. Gordon, Esquire, Michael P. Farris, Esquire, Purcellville, VA, Jordan Lorence, Esquire, Fairfax, VA, Matt M. Paavola, Esquire, Baltimore, for Plaintiffs.

Daniel Karp, Esquire, Victoria M. Shearer, Esquire, Baltimore, for Defendants.

## OPINION

MESSITTE, District Judge.

Plaintiffs Lydia Goulart and Kyle Travers have sued Paul D. Meadows, Chief of the Calvert County, Maryland, Division of Parks and Recreation, and the Board of County Commissioners of Calvert County ("the County"), alleging violation of their rights to free expression under the First Amendment and to equal protection of the law under the Fourteenth Amendment. Plaintiffs' claims stem from the 1999 denial of their applications for use of space at the Calvert County Northeast Community Center in Chesapeake Beach for meetings of a geography club (Goulart) and a fiber arts club (Travers) for their own and other "homeschooled" children. These denials were made pursuant to a County policy prohibiting private educational activity at such centers in order, among other reasons, to avoid duplicative expenditure of resources in light of the County's support of its own public school system. Both Plaintiffs and Defendants have moved for Summary Judgment. The Court will DENY Plaintiffs' Motion and GRANT that of Defendants.

### I.

A) The Board of Commissioners of Calvert County operates four community centers directly supervised by the Division of Parks and Recreation. Upon application and approval, Calvert County residents may use the centers for various purposes set forth in a written Community Center Use Policy ("Use Policy"). The Use Policy establishes as the general purpose of the centers to "afford its citizens a place to participate in activities which benefit the community as a whole," and, as specific purposes, to provide a place for 1) Calvert County Division of Park and Recreation programs, 2) meetings of community organizations, 3) large community events, 4) teen gatherings, and 5) fitness activities.

Under "Uses," the Policy states that the community centers are available for "recreational uses" such as "birthday parties, baby showers, [and] receptions," meetings of community organizations, and fundraising events for qualified non-profit organizations. Conducting "any business, trade, occupation or profession . . . except in support of permitted uses" is prohibited, as is any illegal activity, or any activity that "may incite riot or disturbance, or is in violation of the rules and regulations of the Calvert County Division of Parks and Recreation." The Use Policy indicates that space in the centers will be available to residents on a first-come-first-served basis, or, in the event that demand exceeds capacity, according to a lottery system. Residents are generally permitted to use only one room for no more than two hours per week, with discretion given to the Division of Parks and Recreation to expand such use in order to "maximize the use of the facility." Approval for regular meetings is given on an annual basis.

Applications must submitted to the County Recreation Coordinator at each center, who reserves the right to "refuse or revoke any application not in accordance with the provisions outlined" in the Use Policy. The Use Policy has been modified over time to prohibit private parties and dances in the gymnasiums (which are reserved for athletic purposes) and to establish "Policies to Facilitate Exclusion of Non–County Residents." Other prohibitions have also been added, including a ban on cheerleading and the prohibition at issue here, which pertains to use of the centers for private educational purposes, including "home tutoring" classes.

The first formal articulation of the ban on private educational activities came in an interoffice memorandum dated October 1995, from County Recreation Chair Meadows to the Recreation Coordinators at each center. The memorandum, enti-

tled "Policy—Home Tutoring," applies to "non-Board of Education affiliated/sponsored schools" and alludes to the fact that the Policy has been in effect for some time. It characterizes any use of the centers for private educational purposes as "unacceptable" to the Board of County Commissioners, regardless of the amount of time or space requested. A distinction, however, is made between private educational activities and Board of Education-sponsored tutoring, the latter being deemed permissible when it requires space outside the tutee's home. Board of Education-sponsored tutoring at the centers is permitted for up to six hours per week after consultation between the Parks and Recreation Division Chair and a representative of the Board of Education.

The Home Tutoring Policy came into being as a result of a 1994 application by a "for profit" private school to use one room for four hours per day, three days per week at the Mt. Hope Community Center in Sunderland. Recreation Chief Meadows sought clarification from the Board of County Commissioners as to whether use of the community centers by private educational groups for schooling purposes was appropriate, given that the stated purpose of the centers was to provide recreational opportunities to the community. In a memorandum to the Board detailing the situation, Meadows pointed out that such a school's need for quiet might pose a conflict with other activities at the centers. He also cautioned that, should enrollment of the schools grow and the arrangements become permanent, the centers' ability to carry out their mandate to provide recreational space might be hindered. Finally, he expressed concern that allowing the

school to operate in the Center might "send the wrong message to the [County] Board of Education." At its September 1994 meeting, the Board formally denied the school's application for use of the center, citing its desire to further the policy of providing recreational space to the community.[1]

Thereafter, having consulted with the County Administrator, Meadows began to interpret the Board's decision as precedent for rejecting *any* application by an individual or group seeking to use space for private educational activities. He communicated this view to the Recreation Coordinators both verbally and through the referenced October 1995 memorandum. Accordingly, while the written policy was not formally amended, the ban became a *de facto* part of the Use Policy of the centers.

The ban, however, apparently did not register with all the Coordinators, at least one of whom assumed her position after it was announced. Thus, in a few instances after October 1995, groups were approved to use of the facilities at the Northeast Community Center for homeschooling activities despite the ban. When this came to the attention of Meadows, he advised the Coordinator that the use was impermissible and directed her, in order not "to throw these people out in the middle," to terminate the use at the end of the approval cycle. Eventually the use was terminated, in line with the Policy and its uniform enforcement at other centers.

In 1996, on the occasion of an application for renewal filed by one of the home schooling groups that had been erroneously approved for use of the Northeast Community Center despite the policy ban, the

1. On deposition, Meadows elaborated. The Commissioners rejected the 1994 application, he stated, because they said "that's not what the community centers are for. They're for recreational [sic]." He added that the Com- missioners "had made their commitment to education and that they didn't want to have the possibility of additional over and above educational provision interfering with the opportunities for recreation."

existence of the policy again came to the forefront. At that time, Meadows sent an interoffice memorandum to the newly constituted Board of Commissioners stating his understanding that the Board's actions in denying the private school application in 1994 amounted to a broad policy decision banning all private educational activities at the centers. Again, although there is no record that the Board undertook to formally amend the Use Policy to incorporate the ban, there is also no indication that the Board asked the Parks and Recreation Division to modify its *de facto* practice. The application for renewal of the home school activity at the Northeast Community Center was accordingly denied.

So the matter reposed until the fall of 1999. Then, on November 30, 1999, in response to a request for clarification made by Plaintiffs' counsel in the present case, the Board of Commissioners affirmed that the ban on private educational use was in place, justifying it on the grounds that "allowing the Centers to be used for formal education associated with meeting State requirements for elementary or secondary education .... would amount to a duplication of services."

B) Plaintiffs in the instant case, both residents of Calvert County, filed applications to use space at the Northeast Community Center to conduct private educational activities. In June 1999, Goulart, in the name of "Chesapeake Home Educators," sought the use of rooms every Tuesday from mid-September to mid-De-

cember and from mid-January to late April for a "geography club" in which "[t]he kids will be learning geography, playing games about geography." She reported that approximately sixty participants were expected. In October 1999, Travers sought use of a room "any afternoon each week through Dec., ... any time in the afternoon for 1–1½ hours" for a "fiber arts club—knitting, crochet, spending, weaving, etc." Between fifteen and twenty participants were expected. Recreation Coordinator Mary Lou Johnson subsequently interviewed Travers. When asked if her proposed use was "for homeschoolers," Travers did not answer directly, saying "it's open to anyone who wants to attend." She added, however, that "it's not a class, it's a club and, yes, there will be probably be some homeschoolers who come." Travers' application listed Lydia Goulart as one of the chaperones of the group. She also, at approximately the same time, submitted a separate application on behalf of "Chesapeake Home Educators," seeking use of the community center facility for "regular monthly meetings of membership."[2] Johnson denied the applications of both Goulart and Travers, listing as the reason the County policy against "homeschoolers" using the facilities.

Goulart has homeschooled her three children for at least six years and Travers has homeschooled her three children for at least nine, both at all times under the authority of the Maryland State Board of Education.[3] Although state regulations do

2. The County's initial decision to deny this separate application was reversed and use of the center approved based on the fact that the meetings would involve adults and not the private instruction of children.

3. Homeschooling is permissible in the State of Maryland pursuant to Board of Education regulations. Subtitle 10 Home Instruction, 13A.10.01 General Regulations, as authorized by Md.Code Ann. § 7–301. The text of the

statement of purpose of the governing regulation reads:

01 Home Instruction Program. A. Purpose. The purpose of this regulation is to establish a procedure to be used by the superintendent of each local school system to determine if a child participating in a home instruction program is receiving regular, thorough instruction during the school year in the studies usually taught in the public schools to children of the same age.

not require a county to actively supervise homeschooling when parents, such as Plaintiffs, have designated a private "umbrella" school to do so, all homeschoolers are required to file a homeschooling form with their county board of education. Designating a private umbrella school allows parents to bypass all direct state regulation with the exception of filing the form with the county. The umbrella school, which may be either a religious or a nonpublic one approved by the State Board of Education, assumes responsibility for providing certain basic materials to the student and for conducting an annual review of the student's progress. State regulations also allow for parents to choose to homeschool under the direct supervision of the county board of education, in which case the local superintendent or a designee reviews the students' progress for compliance with state regulations at least once a semester.

Plaintiffs concede that they intended to use the space in the Northeast Community Center to engage in private educational activities that would fulfill state education requirements.[4] They come to Court seeking vindication of what they believe to be their constitutional rights of access to the centers.[5]

## II.

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that they moving party is also entitled to a judgment as a

matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The parties agree that this case does not turn on issues of fact. The sole questions are whether Calvert County's ban on the use of community centers for private educational purposes violates Plaintiffs' rights to free expression and/or equal protection of the law.

## III.

Plaintiffs' principal claim is that the County's ban on private educational activity in the community centers impermissibly burdens their right to free expression. The threshold determination the Court must make, therefore, is whether the First Amendment is implicated by activity in which Plaintiffs seek to engage, since as the Supreme Court has said, "if it is not, we need go no further." *Cornelius v. NAACP Legal Def. and Educ. Fund, Inc.*, 473 U.S. 788, 797, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985).

■ The premise of Plaintiffs' First Amendment claim is that instruction of, or "communication of ideas to the young," is, categorically, protected expressive conduct. The proposition is a questionable one. The Court has found no authority holding that the enterprise of educational instruction, absent some expressive component, is expressive conduct within the meaning of the First Amendment. It is

---

**4.** In her pleadings before the Court, Travers appears to have abandoned any contention that, with regard to the Fiber Club, she did not intend to use the center for home schooling activity.

**5.** The Court is satisfied that an actual controversy exists in this case despite the passage of

three school years since the date the action was initiated. To the extent it may be necessary, the Court finds the dispute to be one "capable of repetition, yet evading review." *S. Pac. Terminal Co. v. ICC*, 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911).

true, as Plaintiffs note, that Justice O'Connor suggested in a concurring opinion in *Roberts v. Jaycees*, 468 U.S. 609, 636, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), that "protected expression may ... take the form of ... instruction of the young." In context, however, she was acknowledging the difficulty of determining whether an association's activity is *"predominantly* protected expression." *Id.* (emphasis added) "Strident, contentious or divisive" words, she commented, are "easy enough to identify." *Id.* But, by implication, it is more difficult to identify protected expression that "may take the form of quiet persuasion, inculcation of traditional values, instruction of the young, and community service." *Id.* She goes on to note that "(t)he considerations that may enter into the determination of when a particular association of persons is predominantly engaged in expression are therefore fluid and uncertain." *Id.* at 637, 104 S.Ct. 3244. By way of example, she contrasts collective lawyering to obtain meaningful access to the courts—"undoubtedly protected by the First Amendment," *Id.*—with ordinary law practice for commercial ends, which is not. *Id.* Similarly, she opines that for a state to compel association with a labor union engaged in ideological activities would run afoul of the First Amendment, whereas imposing rational regulation of the membership of a labor union representing the "general business needs of the membership," such as for the purpose of engaging in collective bargaining, would not. *Id.* To the extent, therefore, that the concurring opinion of a single Supreme Court Justice may ever be understood to establish a constitutional principle, it is clear that Justice O'Connor was saying only that some instruction of the young *may* involve protected expression, whereas some may not.

That is precisely the problem with Plaintiffs' position in the present case.

At the end of the day, they articulate no expressive objective in their proposed use of the County's community centers, whether in their Complaint or in their briefing. This absence is only highlighted by the authority they do cite in support of the notion that "instruction, teaching and communication of ideas to the young" is protected by the First Amendment. *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), concerned students' right to engage in religious activity in campus facilities, precisely because "religious worship and discussion ... are forms of speech and association protected by the First Amendment." *Id.* at 269, 102 S.Ct. 269 (citations omitted). *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), concerned parents' right to control the content of their children's education insofar as it related to their religious freedom under the Free Exercise Clause of the First Amendment. *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) and *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), cited by Justice O'Connor in connection with her observation in *Roberts* that instruction of the young "may" be a form of protected discretion, involved facts and law quite dissimilar from those present here. *Pierce* held unconstitutional a state statute that required parents to send children to public schools. *Meyer* invalidated a statute that made the teaching of foreign languages in any public and private school illegal. Notably, neither decision was predicated on the First Amendment; both were based on the Due Process Clause of the Fourteenth Amendment, a critical difference for purposes of analysis.[6]

---

**6.** Modern substantive due process analysis is generally understood to overlap considerably with equal protection analysis. *See* John E. Nowak and Ronald D. Rotunda, *Constitution-* *al Law,* 5th ed. § 11.4 (West 1995). The Court discusses the applicability of the Equal

Nor have Plaintiffs traced a connection between the neutral speech involved in the administration of geography and fiber arts clubs, or any other classes they might seek to teach in the future, and some more expansive expressive agenda. Such a connection is not even hinted at. In *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, the Supreme Court faced the task of determining whether the exclusion of the NAACP from a roster of organizations to which federal employees could give through a government-run program amounted to an abridgment of the organization's First Amendment rights. 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). The Court determined that despite the fact that the language of the informative listing sought to be included was not *per se* expressive, it was protected speech because it was "characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or particular views." *Id.* at 797, 105 S.Ct. 3439. Plaintiffs have not demonstrated how, if at all, the conduct of geography or fiber arts classes is potentially "intertwined" with the exercise of expressive rights.

Plaintiffs have only asserted that instruction *qua* instruction is expressive. They have otherwise failed to identify the "particularized message" on which the Court's First Amendment inquiry must train. The Supreme Court has held that "it is the obligation of the person desiring to engage in assuredly expressive conduct to demonstrate that the First Amendment even applies. To hold otherwise would be to create a rule that all conduct is presumptively expressive." *Clark v. Cmty. for Creative Non–Violence*, 468 U.S. 288, 294 n. 5, 104 S.Ct. 3065, 82 L.Ed.2d 221

(1984). Because Plaintiffs have not discharged this burden, the Court holds that the First Amendment is not implicated by the County's denial of access to its community centers to individuals or groups seeking to use them for private educational purposes, including homeschoolers. This case is more properly analyzed, if at all, under the second of Plaintiffs' theories, the Equal Protection Clause.

## IV.

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction equal protection of the laws." Three levels of judicial scrutiny are applied in equal protection analysis, only two of which are relevant here.

First, when a classification affects "suspect classes" of persons or burdens a fundamental right, "strict scrutiny" applies and a compelling governmental interest must be shown to justify the classification. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Second, for a classification that relates to other matters, *e.g.*, business, economic or welfare matters, a more lax scrutiny applies and there need only be some conceivable rational basis for the classification. *Id.*[7] Plaintiffs claim that the County's ban on use of the community centers by private educational groups impermissibly abridges their right to equal protection. They ask the Court to use strict scrutiny in examining the lawfulness of the policy, suggesting not only that they may be a suspect class, but that their fundamental right to direct the upbringing of their children is burdened by the policy.

Protection Clause to this case in the following section.

7. The third level of judicial scrutiny, "intermediate scrutiny," applies to classifications based primarily on gender, a matter not in issue in this case.

Although they concede in their Motion for Summary Judgment that "homeschoolers are not a suspect classification," in their reply brief Plaintiffs seem to be arguing that as "private educators [they] have been subject to active discrimination for generations." Even so, Plaintiffs never go so far as to argue outright that they are a "suspect class" and no doubt with good reason. The Supreme Court has never come close to classifying private educators as a suspect class and there does not appear to be the slightest chance that at any time soon it will. Plaintiffs' argument in favor of strict scrutiny, if any, must depend upon the classification of their right to direct the education of their children as a "fundamental right" within the meaning of the Equal Protection Clause.

█ The Court accepts that there is a basic "right of parents to control the education of their own." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (citing *Meyer v. Nebraska*, 262 U.S. 390, 401, 43 S.Ct. 625, 67 L.Ed. 1042 (1923)). They cannot be forced to take certain actions in that respect, *Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (finding that parents cannot be compelled to enroll their children in public school), nor can they be forbidden from taking others, *Meyer*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (holding that legislation cannot prohibit school children from learning languages other than English). But this does not mean that parents have a "fundamental right" under the Equal Protection Clause to insist that the Government make certain benefits available to their children in connection with their education. Except, of course, when such benefits are denied on the basis of constitutionally suspect criteria, the Supreme Court has not deemed education to be a fundamental right subject to strict scrutiny. *See, e.g., Kadrmas v. Dickinson Pub. Sch.*, 487 U.S. 450, 108 S.Ct. 2481, 101 L.Ed.2d 399 (1988) (applying minimal scrutiny to legislation that allowed free bus transportation to students in some school districts, but not in others); *Papasan v. Allain*, 478 U.S. 265, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (applying minimal scrutiny to review of disparities in funding of school districts); *Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (applying minimal scrutiny to statute denying public education to children of illegally resident aliens); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (applying minimal scrutiny to use of local taxes to finance primary and secondary education despite disparity of per pupil expenditures within district).

█ Plaintiffs are seeking to use community centers that Calvert County created for recreational use to hold non-Board of Education instructional classes for children which are intended to fulfill state education requirements. The County has rejected their applications. But it has in no way forced Plaintiffs to take certain actions nor has it forbidden them from taking others in respect of their children or their education. Homeschooled children remain free to participate in any and all parks and recreation department programs at the centers and, according to Defendants, may even claim that participation in their portfolios to fulfill state education requirements. The children may also participate in the usual extracurricular activities at the centers such as scouting. The parents are in no sense being made to desist from home schooling nor are they, at least insofar as the County Division of Parks and Recreation is concerned, being told which subjects may or may not be included in their curricula. Their situation is thus little different from that of other non-suspect groups that in the past have sought to challenge government actions denying benefits in the area

of education on equal protection grounds. What this means, therefore, is that the test of minimal scrutiny should apply to the Court's review of the County's ban on private educational activities at its community centers. Accordingly, the Court need only determine whether the County's policy bears a rational relationship to a legitimate goal of the government in order to hold that it does not violate the Equal Protection Clause. *Heller v. Doe*, 509 U.S. 312, 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993); *Thomasson v. Perry*, 80 F.3d 915, 928 (4th Cir.1996) (citing *Heller*, 509 U.S. at 318–19, 113 S.Ct. 2637); *Freilich v. Bd. of Dirs. of Upper Chesapeake Health, Inc.*, 142 F.Supp.2d 679, 690 (D.Md.2001). The Court has no trouble concluding that it does.

 The stated government interests at stake here are the County's interest in maintaining the recreational character of the community centers and its interest in avoiding duplicative use of its resources. These are legitimate goals inasmuch as the County is the steward of the community centers, *see U.S. v. Johnson*, 159 F.3d 892, 895 (4th Cir.1998) (finding that "allocating space among uses and activities" on public forest recreational land constituted legitimate government interest), and is at the same time the public trustee charged with administering public funds consistent with the best interests of the community. The County believes that its policy against allowing private educational activity at the community centers furthers these interests by preventing "potential conflicts in the future between noisy recreation activities and the need for quiet in a school setting" and by shielding the County from having to expend resources on public schools while simultaneously maintaining the community centers as classroom space for homeschoolers. There is undoubtedly a rational relationship between this policy and these goals. But the test is in fact even less exacting than this.

 "[T]he pertinent question for determining whether the governmental action violated the Equal Protection Clause is whether the [County] officials *reasonably could have believed* that the action was rationally related to a legitimate governmental interest." *Front Royal v. Town of Front Royal*, 135 F.3d 275, 290 (4th Cir.1998) (emphasis added). A law "must be upheld against equal protection challenge if there is any reasonably *conceivable* state of facts that could provide a rational basis for the classification." *Plyler v. Moore*, 100 F.3d 365, 373 (4th Cir. 1996) (quoting *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) (emphasis added). These facts need not rise to the level of "empirical evidence," *Thomasson*, 80 F.3d at 928 (quoting *Beach Communications*, 508 U.S. at 315, 113 S.Ct. 2096). Rather, the party challenging the law in question bears the burden of "negativ[ing] every conceivable basis which might support it," *Thomasson*, 80 F.3d at 928 (quoting *Heller*, 509 U.S. at 320, 113 S.Ct. 2637). Because Plaintiffs have not sustained and cannot possibly sustain this burden, and because rational basis review " is not a license for courts to judge the wisdom, fairness, or logic of legislative choices," *Thomasson*, 80 F.3d at 928 (quoting *Beach Communications*, 508 U.S. at 313, 113 S.Ct. 2096), the Court concludes that the Calvert County's policy banning use of community centers by private educational groups, including homeschoolers, violates no equal protection rights.

The Court finds no material facts to be in dispute and that Defendants are entitled to judgment as a matter of law. Accordingly, their Cross–Motion for Summary Judgment will be GRANTED and Plaintiffs' Motion for Summary Judgment will be DENIED. A separate Order implementing this Opinion will be ENTERED.

### FINAL ORDER

Upon consideration of the parties' Motions for Summary Judgment, it is for the reasons stated in the accompanying Opinion, this 20 day of August, 2002

ORDERED:

1) Plaintiffs' Motion for Summary Judgment (Paper No. 30) is DENIED;
2) Defendants' Cross–Motion for Summary Judgment (Paper No. 31) is GRANTED;
3) Final Judgment is ENTERED in favor of Defendants Paul D. Meadows and the Board of Commissioners of Calvert County and against Plaintiffs Lydia Goulart and Kyle Travers;
4) The Clerk of Court shall CLOSE this case.