2007 ND 9

**NORTH DAKOTA STATE BOARD OF MEDICAL EXAMINERS—INVESTIGATIVE PANEL B, Complainant, Appellant and Cross–Appellee,**

v.

**George S. HSU, M.D., Respondent, Appellee and Cross–Appellant.**

No. 20060134.

Supreme Court of North Dakota.

Jan. 23, 2007.

John M. Olson, Special Assistant Attorney General, Bismarck, N.D., for complainant, appellant, and cross–appellee.

Randolph E. Stefanson (argued) and Kent B. Gravelle (on brief), Stefanson, Plambeck & Foss, Moorhead, MN, for respondent, appellee, and cross–appellant.

VANDE WALLE, Chief Justice.

[¶ 1] The North Dakota State Board of Medical Examiners ("Board") appealed from a district court judgment reversing the Board's order revoking Dr. George Hsu's license to practice medicine and from a writ of mandamus directing the Board to establish a reasonable plan for supervision of Dr. Hsu's practice of medicine. Dr. Hsu cross-appealed from the judgment. We affirm in part, reverse in part, and remand with instructions to reinstate the Board's decision.

I

[¶ 2] Dr. Hsu was licensed to practice medicine in North Dakota in 1985, and is board certified in family practice. Since 1987, he has been an independent physician in his rural health·clinics in Elgin and Glen Ullin and has had hospital privileges at Jacobson Memorial Hospital in Elgin.

[¶ 3] This disciplinary proceeding involves separate complaints brought against Dr. Hsu in 2003 and in 2004. In a September 2003 complaint, Investigative Panel B of the Board alleged Dr. Hsu had engaged in a continued pattern of inappropriate care of seven patients in violation of N.D.C.C. § 43–17–31(21) and had failed to appropriately document medical records for those patients. After a formal hearing on the 2003 complaint, an administrative law judge ("ALJ") recommended finding the greater weight of the evidence established Dr. Hsu had engaged in a continued pattern of inappropriate care from July 2001 through June 2003 for the seven pa-

tients identified in the complaint. The ALJ recommended finding Dr. Hsu's medical care and the substance and lack of timely documentation of his medical care for those patients demonstrated a continued pattern of inappropriate care. The ALJ recommended revoking Dr. Hsu's medical license unless he agreed to a system of monitoring and review as required by the Board in its discretion. According to the Board's executive secretary, he advised Dr. Hsu that the Board would consider the ALJ's recommended disposition of the 2003 complaint during a teleconference on December 29, 2003, and Dr. Hsu instead asked to personally appear before the Board at its scheduled March 19, 2004, meeting.

[¶ 4] Meanwhile, Investigative Panel B of the Board issued a March 19, 2004, complaint against Dr. Hsu, realleging the claims in the 2003 complaint and also alleging Dr. Hsu had provided inappropriate care for three additional patients in December 2003 and January 2004. At the Board's March 19, 2004, meeting and before considering the ALJ's recommendation on the 2003 complaint, the Board temporarily suspended Dr. Hsu's license under N.D.C.C. § 43–17–32.1. The Board then considered the claims in the 2003 complaint and unanimously adopted the ALJ's recommended findings of fact and conclusions of law. However, a motion to revoke Dr. Hsu's license failed, and a motion to adopt the ALJ's recommended sanction for monitoring failed for lack of a second. The Board then unanimously voted to delay disposition on the 2003 complaint until after a hearing on the March 19, 2004, complaint.

[¶ 5] After a formal hearing on the March 19, 2004, complaint, the ALJ issued a decision taking official notice of the 2003

disciplinary action against Dr. Hsu. In addressing the allegations in the 2004 complaint, the ALJ recommended finding that Dr. Hsu provided substandard or inappropriate care for one patient, because he failed to promptly recognize the clear signs of an acute myocardial infarction and delayed appropriate care for that patient, who subsequently died. The ALJ recommended finding that Dr. Hsu did not provide substandard or inappropriate care for the two other patients identified in the 2004 complaint because Dr. Hsu followed the patients' families' wishes and essentially obtained informed consent from the patients' families, but that Dr. Hsu failed to provide appropriate medical documentation for his care of those two patients. The ALJ said:

> Dr. Hsu does not seem to recognize that he is not an island. He tends to gauge whether he gives proper medical care by the likely costs and by the actual results rather than proper protocols. He tends to believe that a low cost and the end result justifies the procedures used. To a large extent, it appears, Dr. Hsu has been lucky. With Patient 1, however, he was not so lucky. As stated previously, the evidence from the last hearing clearly showed that Dr. Hsu is not a great physician, but neither does that evidence, even when coupled with the evidence from this hearing, show that he is a poor physician. Rather, the evidence shows that he is a caring physician, though perhaps a somewhat misguided physician.

Dr. Hsu acknowledged at the first hearing that he is "out of step" with what the practice of medicine currently requires for appropriate care of patients in North Dakota. He maintains that he operates on a basis of mutual trust between patient and physician, and that no one has been harmed by the care he has given to patients over the years. Again,

that may not be the case, now, considering the evidence at this hearing. It is clear that in the rural health care setting Dr. Hsu is doing what he believes is best to keep down the costs of medical care for his patients, while still giving them adequate care. With this purpose, "no harm no foul" seems to be Dr. Hsu's response and his motto in regard to the allegations of inappropriate care. Whether he will continue in his purpose employing his motto remains to be seen.

. . . .

Finally, it is ultimately difficult to determine if there has been inappropriate medical care given in several of these cases (from both hearings) when there is not proper documentation, *i.e.*, not timely documentation of appropriate substance. This is especially so when it comes to physician/patient relationships and informed consent. There remain many questions not really answered by the medical records but only by Dr. Hsu's testimony and speculation. This, by itself is not right, or appropriate medical care. In regard to documentation only, or lack thereof, his patients may suffer. Has he really performed to date as he has indicated? Perhaps, for the most part, Dr. Hsu has provided adequate medical care, the care required under the circumstances, or at least the care his patients want. But, according to the testimony of many doctors and some doctors who know rural medicine, Dr. Hsu has not been providing appropriate documentation in several instances, and likely, not for many other cases not part of these two Complaints.

Again, Dr. Hsu believes that his after-the-fact explanations of what occurred, and why, is appropriate. Yet, even if he is right as to the substance of the care he has given his patients, as being appropriate, he presents a disservice to his

patients and to others in the medical profession by not providing timely and adequate documentation. As shown at the first hearing and confirmed at this hearing, about his documentation there is no doubt, it is inadequate and sometimes nonexistent.

The ALJ recommended revoking Dr. Hsu's license unless he agreed to monitoring and review as required by the Board in its discretion.

[¶ 6] The Board adopted all but one of the ALJ's recommended findings and conclusions, but declined to adopt the ALJ's recommended disposition for monitoring and instead decided to revoke Dr. Hsu's license. The Board explained its rationale for not adopting the ALJ's recommended sanction:

1. The seriousness of the departure from the standard of care.

2. Dr. Hsu's prior behavior, particularly the fact that he has a prior history of disciplinary action by this Board as well as action taken against him by the Jacobson Memorial Hospital in Elgin, North Dakota.

3. The Board finds that Dr. Hsu's attitude, as evidenced by his prior behavior and by his demeanor when appearing before the Board, makes it extremely unlikely that any sort of monitoring plan or other direction from the Board could be successful.

4. The Board finds that the proposed system of monitoring and review is unworkable. In this case such a plan would essentially require the full time personal attendance of a hands-on physician who would monitor Dr. Hsu's practice and report to the Board as well as complete cooperation from Dr. Hsu.

[¶ 7] Dr. Hsu appealed to the district court. The court rejected Dr. Hsu's constitutional challenges to the Board's decision, concluding the Board's use of Dr. Craig Lambrecht, a Board member and investigator for Investigative Panel B, to investigate the claims against Dr. Hsu did not violate due process and the Board's use of the preponderance of the evidence standard in physician disciplinary proceedings did not violate due process or equal protection. The court concluded, however, the Board violated N.D.C.C. § 28–32–39(3) by delaying its decision on the ALJ's recommended disposition of the 2003 complaint, and the court decided the ALJ's recommended disposition of the 2003 complaint became the Board's final order for that complaint. The court further concluded the Board's rationale for departing from the ALJ's recommended disposition of the 2004 complaint was not supported by the record and was insufficient. The court reversed the Board's order revoking Dr. Hsu's license and remanded to the Board for disposition in accordance with the court's decision.

[¶ 8] Rather than appealing the district court's decision to this Court, the Board thereafter issued a further explanation of its rationale for departing from the ALJ's recommended disposition and again decided to revoke Dr. Hsu's license:

1. *The Seriousness of the Departure from the Standard of Care*

The evidence against Dr. Hsu was presented at two administrative hearings. The evidence from those hearings is cumulative. Based on the evidence presented at the first hearing the Board found that Dr. Hsu engaged in a "continued pattern of inappropriate care" (and that he failed to maintain adequate medical records). Subsequently the Board found that in the case of patient # 1 (second Hearing) Dr. Hsu failed to promptly recognize the clear signs of an acute myocardial infarction, did not ad-

minister thrombolytic therapy immediately after obtaining the first EKG results, failed to use IV-nitro, failed to order a chest x-ray before giving heparin, failed to consult a cardiologist within a reasonable period of time, and failed to transfer the patient to a tertiary care center early enough. The patient died....

Although the Board allowed most of the ALJ's editorial comment and discussion to remain in the Findings of Fact, the significant finding is that Dr. Hsu "provided substandard and inappropriate care to patient 1". Dr. Hsu's management of this case constitutes a serious departure from the standard of care. The inappropriate care of patient # 1 in the second complaint was more egregious than the inappropriate care of the patients embraced by the first complaint.

It is not necessary to debate whether or not Dr. Hsu's management of this patient constitutes a "gross" deviation from the standard of care. Gross negligence constitutes a separate and distinct basis for taking disciplinary action against a physician. Gross negligence is essentially the absence of any care. Gross negligence was not alleged in this case. Failure to promptly recognize the clear signs of an acute myocardial infarction, failure to administer thrombolytic therapy immediately after obtaining the first EKG results, failure to use IV-nitro, failure to order a chest x-ray before giving heparin, failure to consult a cardiologist within a reasonable period of time, and failure to transfer the patient to a tertiary care center within the critical time period was a serious departure from the standard of care. Whether or not it was a "gross" deviation is largely academic.

2. *Dr. Hsu's Prior Behavior*

In 1996 Dr. Hsu was the subject of disciplinary action by this Board.... At that time the Board found that Dr. Hsu "failed to maintain appropriate documentation in medical records for diagnosis, testing, and treatment of patients". Pursuant to a stipulation, signed by Dr. Hsu, the Board then entered an order suspending Dr. Hsu's medical license for one year. That order of suspension was stayed on certain conditions.

It is evident to the Board that its attempt to remediate Dr. Hsu's substandard record keeping in 1996 was not successful:

A) During the second evidentiary hearing (August 17–18, 2004) Dr. Hsu testified that keeping his charts up-to-date was a "chronic problem".

B) On 10–05–01 Dr. Hsu's privileges to practice at the Jacobson Memorial Hospital were suspended because his records were not being completed in a timely manner....

C) Dr. Hsu has not only failed to complete his medical records in a timely manner but even more alarming his records lack the required substance. In his analysis following the second hearing the ALJ stated that "... it is ultimately difficult to determine if there has been inappropriate medical care given in several of these cases (from both hearings) when there is not documentation, i.e., not timely documentation of appropriate substance ...".

D) About seven years after Dr. Hsu's license was restored to full and unrestricted status the ALJ wrote "as shown at the first Hearing and confirmed at this Hearing, about his documentation there is no doubt, it is inadequate and sometimes nonexistent."

Thus the Board's attempt to remediate Dr. Hsu's substandard record keeping in 1996 was unsuccessful in

two respects. His failure to keep timely records became a "chronic" problem and the content of his records is inadequate. In short, the Board's prior attempt to make Dr. Hsu amend his ways was a failure.

3. *Dr. Hsu's Attitude Indicates to the Board That He is Not a Candidate for Monitoring*

The Board's conclusion is based in part on the fact that the Board has had the benefit of seeing and hearing Dr. Hsu during his appearances before the Board. Like judges and juries, the members of the Board of Medical Examiners, are routinely required to make subjective determinations that profoundly affect the lives of the people who appear before them. Like judges and juries they must decide that.... I believe this person but not that one ... I give this witness' testimony more credibility than that one ... I believe this person will respond to a remedial program.... I do not believe it is appropriate to place this person on probation ... etc.

In this case the Board does not believe it is appropriate to establish a monitoring program for Dr. Hsu. While the Board's conclusion that Dr. Hsu's attitude does not lend itself to a successful monitoring program is in part a subjective determination based on its observation of Dr. Hsu, the conclusion is also based on the objective record. Dr. Hsu has never expressed any indication that he accepts the fact that he has practiced substandard medicine. Dr. Hsu takes no responsibility for his behavior.

The Board notes the following objective examples of Dr. Hsu's attitude regarding the proposed monitoring program, his unwillingness to cooperate with the Board, and his unwillingness to abide by the rules that apply to other physicians.

*Example "A"*

When Dr. Hsu appeared before the Board on March 19, 2004 one of the Board members questioned him about his attitude toward the ALJ's recommendation. The following exchange occurred:

Dr. Pearson: Have you read [the ALJ's] recommendations?

Dr. Hsu: Ya well ah ya.

Dr. Pearson: And?

Dr. Hsu: Ummm, what do I, am I willing to comply with those or.

Dr. Pearson: What is your position?

Dr. Hsu: *Umm you know um well ah. My position is that [the ALJ] doesn't have any ah alternative but to order those kinds of things. The only, the only ah my only hope is to, that you guys would ah listen to the issues and and make a, make a decision* but I know I mean I I I do not see that it's and I do not agree or ah I I don't see that it is wrong to allow people to die if that's their desire. And ah even if they are salvageable, I try to tell them that this isn't bad. You've got a heart attack here, they can fix that, you can get a bypass. Go to Bismarck. Nope I don't want it. I mean do I respect his wishes or not? Do I say "no" you go anyway? I mean these are ethical questions that I think deserve attention. (Emphasis added)

Dr. Elder: To the members of Panel A, how do you wish to proceed now?

Dr. Pearson: In reading the recommended Order from the administrative law judge he recommends that the license to practice medicine in North Dakota of Dr. Hsu be revoked unless Dr. Hsu agrees to the practice of medicine in North Dakota under a

system of monitoring and review as required by the Board in its discretion. *In reading all of the information and listening to you today Dr. Hsu, I don't hear or read that a system of monitoring or review would be useful in this situation.* So I'm recommending revocation. And I put that in the form of a motion. (Emphasis added).

*Example "B"*

During the first evidentiary hearing (11–21–03) Dr. Hsu made the following statement:

Dr. Hsu: "…. And lastly, I need, I'd like to clarify exactly what it is that the Board of Medical Examiners has jurisdiction over. One of the main issues in this, in the allegations are that of documentation. And, there are some things in medical practice where, you know, there are phrases like, if it's not documented it's not done, that, and documentation seems to be an important part of the practice. My own feeling is that, that's really not the case. Documentation is a separate entity. *And I also believe that unless it's fraudulent, that is not under purview of the Board of Medical Examiners.* For instance, tardiness or, you know, sketchy kind of documentation, you know, while it may be important in other aspects of medicine in terms of protection against malpractice or substantiation of ability, it may be important in those aspects, but it's not necessarily a part of, you now, a reflection of medical care. So poor documentation does not necessarily mean poor care and I think that is an issue that I would like to push".

It is appalling to find that a physician who has previously been disciplined for poor record keeping has the attitude that the adequacy of his records is none of the Board's business.

*Example "C"*

When Dr. Hsu appeared before the Board on November 19, 2004 he stated that:

Dr. Hsu: "… [the ALJ] says that I'm capable and intelligent but misguided and I would ask and if if I'm misguided fine I can, I can, ah, I can change the way I do things it's not *it's not that I don't know what the course of action should be but it's often times I choose not to follow that course of action* …". (emphasis added)

Dr. Hsu does not believe that standard of care applies to him.

4. *The Board Believes the Proposed System of Monitoring is Unworkable*

The proposition that the Board adopted the ALJ's proposed monitoring plan 60 days after the proceedings closed is a legal fiction that does not represent the will of the Board. The proposed monitoring program was rejected by the Board on March 19, 2004. The motion to adopt the ALJ's proposal failed when no member of the Board was even willing to second the motion. At best that idea had support from one Board member and that was before Dr. Hsu's care of patient #1 (second complaint) was added to the evidence against him. After that case was placed in evidence the vote to revoke Dr. Hsu's license was unanimous.

Obviously a system of monitoring would require the full cooperation of Dr. Hsu. The Board does not believe that it has Dr. Hsu's full cooperation. It is the Board's opinion that effective monitoring of Dr. Hsu's practice could only be accomplished by employing a physician mentor who would accompany Dr. Hsu on every patient visit. The period of monitoring would have to be extensive.

It seems improbable at best that a physician could be identified who would be acceptable to the Board and to Dr. Hsu and that all of the logistical and financial considerations could be resolved to create a workable program. Nevertheless, the Board would attempt to solve those practical problems and implement such a program if it truly believed that the program could be successful and that long term remediation could be achieved. The Board does not believe that to be the case. The concern is not that Dr. Hsu needs additional training on providing proper care and maintaining proper records, the problem is Dr. Hsu's personal unwillingness to provide care and maintain records pursuant to the standard of care. Dr. Hsu simply does not believe he must meet the standard of care imposed on all medical professionals. No amount of monitoring will change his disdain for the established standard of care. The Board cannot monitor Dr. Hsu's practice for the remainder of his career.

In the final analysis the determination as to whether or not the deficiencies in Dr. Hsu's practice can be rectified by a monitoring program is largely a medical decision. It is the combined judgment of the members of the State Board of Medical Examiners that monitoring is inappropriate in this case.

[¶ 9] Dr. Hsu then petitioned the district court for a writ of mandamus. The district court issued a writ of mandamus, concluding the Board's further explanation did not comply with the court's order for remand and considered evidence outside the record in violation of N.D.C.C. ch. 28–32. The court ordered the Board to adopt the ALJ's recommended disposition and establish a reasonable plan for supervision of Dr. Hsu's medical practice. The court subsequently awarded Dr. Hsu attorney's fees under N.D.C.C. § 28–32–50.

II

[¶ 10] Chapter 43–17, N.D.C.C., authorizes the creation of a state board of medical examiners for licensure and discipline of physicians in North Dakota. At the time relevant to this proceeding, N.D.C.C., § 43–17–03,[1] required the governor to appoint an eleven member state board of medical examiners, consisting of eight doctors of medicine, a doctor of osteopathy, and two public members not affiliated with any group or profession that provides or regulates healthcare. Section 43–17–06, N.D.C.C., authorizes the Board to elect a president from its members and to appoint a secretary-treasurer as the general administrative and prosecuting officer of the Board. Section 43–17–30.1, N.D.C.C., authorizes the Board to take appropriate disciplinary action against licensed physicians, which may include revocation of a license, suspension of a license, probation, censure, a fine, or imposition of conditions relating to the physician's practice. Under N.D.C.C. § 43–17–31(21), discipline may be imposed against a physician for a continued pattern of inappropriate care. See also N.D.C.C. § 43–17–31(26) (discipline may be imposed against physician for lack of appropriate documentation in medical records for diagnosis, testing, and treatment of patients). Chapter 43–17.1, N.D.C.C., authorized the president of the Board to designate two five-member investigative panels, each comprised of four physicians and one public member of the Board to investigate complaints against physicians and, if appropriate, to file formal complaints with the Board for disposition under N.D.C.C. ch. 28–32. See N.D.C.C. §§ 43–17.1–02 and 43–17.1–05. Under N.D.C.C. § 43–17.1–05(2), the Board members who have served on an investigative panel for a complaint may not

---

1. In 2005, the legislature amended N.D.C.C. §§ 43–17–03 and 43–17.1–02 to provide for a twelve member board and two six-member investigative panels. See 2005 N.D. Sess. Laws ch. 359.

participate in any proceeding before the Board regarding that complaint.

[¶ 11] By definition, the Board is an administrative agency, and its procedures for physician licensure and discipline are governed by the Administrative Agencies Practice Act, N.D.C.C. ch. 28–32. *Singha v. State Bd. of Med. Exam'rs*, 1998 ND 42, ¶ 12, 574 N.W.2d 838; *Sletten v. Briggs*, 448 N.W.2d 607, 609 (N.D.1989). *See* N.D.C.C. § 28–32–01(2) (defining administrative agency to mean board, bureau, commission, department, or other administrative unit of the executive branch of state government). It is well established that courts exercise a limited review in appeals from decisions by administrative agencies, including the Board. *Jones v. North Dakota State Bd. of Med. Exam'rs*, 2005 ND 22, ¶ 10, 691 N.W.2d 251; *Huff v. North Dakota State Bd. of Med. Exam'rs*, 2004 ND 225, ¶ 8, 690 N.W.2d 221. Under N.D.C.C. § 28–32–46, a district court must affirm an administrative agency order unless:

1. The order is not in accordance with the law.

2. The order is in violation of the constitutional rights of the appellant.

3. The provisions of this chapter have not been complied with in the proceedings before the agency.

4. The rules or procedure of the agency have not afforded the appellant a fair hearing.

5. The findings of fact made by the agency are not supported by a preponderance of the evidence.

6. The conclusions of law and order of the agency are not supported by its findings of fact.

7. The findings of fact made by the agency do not sufficiently address the evidence presented to the agency by the appellant.

8. The conclusions of law and order of the agency do not sufficiently explain the agency's rationale for not adopting any contrary recommendations by a hearing officer or an administrative law judge.

[¶ 12] In an appeal from a district court's decision on an administrative appeal, this Court reviews the agency order in the same manner as the district court. N.D.C.C. § 28–32–49. An agency's decisions on questions of law are fully reviewable. *Jones*, 2005 ND 22, ¶ 11, 691 N.W.2d 251; *Huff*, 2004 ND 225, ¶ 8, 690 N.W.2d 221. In reviewing an agency's findings of fact, however, we do not substitute our judgment for that of the agency or make independent findings. *Huff*, at ¶ 8. In *Power Fuels, Inc. v. Elkin*, 283 N.W.2d 214, 220 (N.D.1979), we examined and explained the constitutional underpinnings for our deferential standard of review of an administrative agency's findings of fact:

> In construing the "preponderance of the evidence" standard to permit us to apply the weight-of-the-evidence test to the factual findings of an administrative agency, we do not make independent findings of fact or substitute our judgment for that of the agency. We determine only whether a reasoning mind reasonably could have determined that the factual conclusions reached were proved by the weight of the evidence from the entire record. In so doing we conclude that we are not exercising a nonjudicial function ... nor are we violating any separation-of-powers doctrine inherent in the North Dakota Constitution.

### III

[¶ 13] In his cross-appeal from the judgment, Dr. Hsu claims the district court erred in deciding the Board's decision did not violate his due process or

equal protection rights under the federal and state constitutions.

## A

[¶ 14] Under the general provisions for administrative agency decisions in N.D.C.C. § 28–32–46(5), the standard of proof for physician disciplinary proceedings in North Dakota, including license revocation proceedings, requires that the Board's findings of fact be supported by a preponderance of the evidence. *See Sjostrand v. North Dakota Workers Comp. Bureau,* 2002 ND 125, ¶ 24, 649 N.W.2d 537 (stating N.D.C.C. § 28–32–46 provides both a standard of review and an evidentiary standard of proof for agency decisions).

## 1

[¶ 15] Dr. Hsu argues the preponderance of evidence standard violates the due process provisions of the federal and state constitutions under the three-prong test of *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). He claims the preponderance of evidence standard violates minimum due process requirements because "a revocation proceeding potentially takes away a private property interest, prohibits a doctor from practicing his profession, and subjects a doctor to public embarrassment."

[¶ 16] For due process purposes, the function of a standard of proof is to "'instruct the factfinder concerning the degree of confidence our society thinks [the factfinder] should have in the correctness of factual conclusions for a particular type of adjudication.'" *Addington v. Texas,* 441 U.S. 418, 423, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) (quoting *In re Winship,* 397 U.S. 358, 370, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring)). "The standard serves to allocate the risk of error between the litigants and

to indicate the relative importance attached to the ultimate decision." *Addington,* at 423, 99 S.Ct. 1804.

[¶ 17] In *Mathews,* 424 U.S. at 332–49, 96 S.Ct. 893 the United States Supreme Court outlined an analytical framework for determining due process requirements in a case that decided the quantum of process due recipients of social security disability benefits before the government could terminate those benefits. The Court established a three-prong test for due process challenges, requiring the balancing of: (1) the nature of the private interest affected by the governmental action; (2) the countervailing nature of the governmental interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail; and (3) the risk of an erroneous deprivation of the private interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards. *Mathews,* at 335, 96 S.Ct. 893. *See Beckler v. North Dakota Workers Comp. Bureau,* 418 N.W.2d 770, 773–75 (N.D.1988) (applying *Mathews* framework to termination of workers compensation disability benefits).

[¶ 18] The United States Supreme Court has applied the *Mathews* framework to due process challenges to standards of proof. *Santosky v. Kramer,* 455 U.S. 745, 758–70, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *Addington,* 441 U.S. at 425–33, 99 S.Ct. 1804. In *Santosky,* at 758–70, 102 S.Ct. 1388 the Court held that a statute authorizing the use of a fair preponderance of evidence for parental termination proceedings violated due process and that due process required clear and convincing evidence before the state could terminate parental rights. In *Addington,* at 425–33, 99 S.Ct. 1804 the Court held that due process required clear and convincing evidence before an individual could be involuntarily

committed for an indefinite period in a state mental hospital.

[¶ 19] Some state courts have applied the *Mathews* framework to analyze the constitutional requirements for the standard of proof for medical disciplinary proceedings and have held that due process requires proof by clear and convincing evidence. *Johnson v. Board of Governors of Registered Dentists*, 913 P.2d 1339, 1345–47 (Okla.1996); *Nguyen v. State*, 144 Wash.2d 516, 29 P.3d 689, 690–97 (2001); *Painter v. Abels*, 998 P.2d 931, 941–42 (Wyo.2000).

[¶ 20] In *Johnson*, 913 P.2d at 1345–47, the Oklahoma Supreme Court balanced the *Mathews* factors and held that due process required clear and convincing evidence before a dentist could be disciplined. The court held an administrative rule requiring proof by a preponderance of the evidence did not comply with minimum federal or state constitutional due process requirements. *Id.* Relying on *Addington*, the court said the disciplined dentist's interests were more than monetary losses and were substantial, including the possible loss of a constitutionally protected property right, the loss of a livelihood, and the loss of a professional reputation. *Id.* at 1346. The court identified the state's interest in the health, safety, and welfare of its citizens, but said there was a high risk of error when an agency seeks to revoke a professional license by acting as investigator, prosecutor, and decision maker. *Id.* The court said the risk was increased because a competitor of the disciplined dentist served as the investigator and made prosecutorial recommendations to the Board. *Id.*

[¶ 21] In *Nguyen*, 29 P.3d at 690–97, the Washington Supreme Court balanced the *Mathews* factors and held that due process required clear and convincing evidence before a physician could be disci-

plined. The court said an individual's interest in a professional license was "profound" and medical disciplinary proceedings were "quasi-criminal," with a stigma more substantial than mere loss of money. *Id.* at 694–95. The court said the risk of error was high in a proceeding to revoke a medical license, especially where the agency acts as investigator, prosecutor, and decision maker and was further aggravated by the subjective standard of conduct applicable to determine discipline. *Id.* at 695–96. In analyzing the state's interest, the court said that factor related to the practical and financial burdens imposed upon the state by a possible substitute procedure and did not relate to the state's interest in a reliable substantive outcome. *Id.* at 696–97. The court further explained the state's interest in protecting the public from physicians who abuse their patients or who are not competent to practice was not furthered by a standard of proof that results in a greater number of erroneous license revocations than would occur under a higher standard. *Id.* at 697.

[¶ 22] In *Painter*, 998 P.2d at 941, the Wyoming Supreme Court applied *Mathews* to a physician disciplinary proceeding and held that due process required proof by clear and convincing evidence. The court said a physician's interest in a professional license was substantial and involved the potential loss of a protected property right, the physician's livelihood, and the physician's professional reputation. *Id.* The court recognized the state's interest in protecting the health, safety, and welfare of its citizens from a physician's incompetence or misconduct was legitimate and substantial. *Id.* The court said the risk of error in a physician disciplinary proceeding was high because the agency acts as investigator, prosecutor, and decision mak-

er. *Id.* The court balanced the three *Mathews* factors and held the preponderance of evidence standard for physician discipline proceedings failed to protect the physician's basic interests. *Id.* The court acknowledged its decision "arguably" gave Wyoming physicians greater due process protections than required by the federal constitution. *Id.*

[¶ 23] Other courts have applied the *Mathews* framework and held that due process is satisfied by the preponderance of evidence standard for medical disciplinary proceedings. *Eaves v. Board of Med. Exam'rs*, 467 N.W.2d 234, 237 (Iowa 1991); *Rucker v. Michigan Bd. of Med.*, 138 Mich. App. 209, 360 N.W.2d 154, 155 (1984); *Petition of Grimm*, 138 N.H. 42, 635 A.2d 456, 461 (1993); *In re Polk*, 90 N.J. 550, 449 A.2d 7, 12–17 (1982); *Anonymous v. State Bd. of Med. Exam'rs*, 329 S.C. 371, 496 S.E.2d 17, 19–20 (1998); *Gandhi v. Medical Examining Bd.*, 168 Wis.2d 299, 483 N.W.2d 295, 298–300 (Ct.App.1992).

[¶ 24] In *Grimm*, 635 A.2d at 461–62, the New Hampshire Supreme Court held there was no due process or equal protection violation in the use of the preponderance of evidence standard of proof for disciplinary proceedings against a psychologist. The court recognized a psychologist's right to engage in his profession was a significant private interest. *Id.* at 461. The court said, however, there was a minimal risk of an erroneous deprivation of a psychologist's right to practice psychology by use of the preponderance of evidence standard because there could be no disciplinary action taken without an administrative hearing, the fact-finding phase of a disciplinary proceeding was an adversarial process that allowed the psychologist to defend himself, and the decision maker was comprised of experts in the field, which minimized the risk of confusion and misunderstanding about the subject mat-

ter of the proceeding. *Id.* The court said the state had a substantial interest in the regulation and supervision of psychologists to assure a high quality of mental health care and to protect the public. *Id.* The court weighed those factors and concluded the preponderance of evidence standard satisfied due process. *Id.*

[¶ 25] In *Polk*, 449 A.2d at 12–17, the New Jersey Supreme Court reached the same result under a similar balancing of interests and rationale. The court distinguished *Santosky* and *Addington*, explaining a medical license was subject to reasonable regulation in the public interest and did not rise to the level of a fundamental right entitled to protection by a standard of proof greater than a preponderance of evidence. 449 A.2d at 13–14. The court said the state has a paramount interest in protecting the general health and welfare of the public, and the right of physicians to practice their profession was subordinate to that interest. *Id.* at 14–15. The court further concluded the preponderance of evidence standard did not engender an intolerable risk of error because disciplinary proceedings involved high substantive standards as a basis for discipline and the licensee could defend adequately against the charges through the protections of the administrative process. *Id.* at 15–17.

[¶ 26] In *Gandhi*, 483 N.W.2d at 297–98, a statute required a preponderance of evidence for physician disciplinary actions, and a physician argued that standard violated due process. The Wisconsin Court of Appeals recognized the physician's interest was substantial and the potential deprivation was great. *Id.* at 299. The court concluded, however, the state's interest outweighed the physician's interest, because the state had not only a strong interest but an obligation to protect the health, safety, and welfare of its citizens.

*Id.* The court recognized the practice of medicine was an area in which incompetence, wrongdoing, or misconduct could threaten life itself and protecting citizens was one of the fundamental reasons for a government's existence. *Id.* The court said the state's obligation was superior to the privilege of any individual to practice his or her profession. *Id.* at 299–300. The court further concluded the risk-of-error analysis also inured to the statute's benefit, because there were ample safeguards to ensure due process in administrative proceedings. *Id.* at 300. The court explained that because the ultimate fact finders were mostly physicians, they were uniquely qualified to understand the evidence and standards and render a decision, which lessened the risk of error. *Id.* The court thus concluded the preponderance of evidence standard did not violate due process. *Id.*

[¶ 27] We agree with the rationale and weighing of interests exemplified by the decisions in *Grimm, Polk,* and *Gandhi.* Under the *Mathews* framework for analyzing due process claims, we conclude the preponderance of evidence standard satisfies due process. We are mindful a physician's interest in a medical license is a property interest and is not insubstantial. In our view, however, the State's interest in protecting the health, safety, and welfare of its citizens is superior to a licensee's interest. Furthermore, we conclude the procedures envisioned by the Administrative Agencies Practice Act and the procedures for investigating and adjudicating complaints in N.D.C.C. chs. 43–17 and 43–17.1, coupled with the authority and responsibility delegated by the legislature to the Board to protect the public, supports our conclusion that the preponderance of evidence standard satisfies due process under the *Mathews* framework. This Court has long held that a party in an administrative proceeding is not denied due process merely because the administrative agency performs all three functions of investigation, prosecution, and adjudication. *E.g. Saakian v. North Dakota Workers Comp. Bureau,* 1998 ND 227, ¶ 21, 587 N.W.2d 166. The combination of functions has long been argued as a rationale for limiting the authority of administrative agencies, but persistent calls for a greater separation of functions have been rejected. 2 Richard J. Pierce, Jr., *Administrative Law Treatise* § 9.9 (4th ed.2002). In medical disciplinary proceedings, as we explain in ¶¶ 35–36, the functions are separated and the Board is the ultimate fact finder and consists mostly of physicians who are trained and experienced in the profession, which, coupled with the procedural safeguards envisioned by our statutes, minimizes the risk of error. We conclude the preponderance of evidence standard for medical disciplinary proceedings satisfies due process under the *Mathews* framework.

2

[¶ 28] Dr. Hsu also argues that the use of the preponderance of evidence standard in medical disciplinary proceedings violates the equal protection clauses of the federal and state constitutions, because North Dakota law imposes a more rigorous clear and convincing standard of proof for attorney disciplinary proceedings. He argues it is wrong to impose one standard on the medical profession and a higher standard on attorneys.

[¶ 29] In *State v. Leppert,* 2003 ND 15, ¶¶ 7–8, 656 N.W.2d 718, we recently outlined our standards for equal protection challenges:

> The equal protection clauses of the state and federal constitutions do not prohibit legislative classifications or require identical treatment of different groups of people. *Eagle v. North Dakota Workers*

*Comp. Bureau,* 1998 ND 154, ¶ 9, 583 N.W.2d 97. Legislative classifications are subject to different standards of scrutiny, depending on the right infringed by the challenged classification. *Id.* In *Gange v. Clerk of Burleigh County Dist. Court,* 429 N.W.2d 429, 433 (N.D. 1988) (citations omitted) we outlined three levels of judicial scrutiny for reviewing equal protection claims:

> We apply strict scrutiny to an inherently suspect classification or infringement of a fundamental right and strike down the challenged statutory classification "unless it is shown that the statute promotes a compelling governmental interest and that the distinctions drawn by the law are necessary to further its purpose." When an "important substantive right" is involved, we apply an intermediate standard of review, which requires a " 'close correspondence between statutory classification and legislative goals.' " When no suspect class, fundamental right, or important substantive right is involved, we apply a rational basis standard and sustain the legislative classification unless it is patently arbitrary and bears no rational relationship to a legitimate governmental purpose.

Under the federal constitution, unless a statute invokes strict scrutiny because it interferes with a fundamental right or discriminates against a suspect class, the statute will ordinarily survive an equal protection challenge if it is rationally related to a legitimate governmental purpose, and heightened or intermediate scrutiny is generally applied only in cases involving classifications based on sex or illegitimacy. *Kadrmas v. Dickinson Pub. Sch.,* 487 U.S. 450, 457–59, 108 S.Ct. 2481, 101 L.Ed.2d 399 (1988).

[¶ 30] Here, as in *Leppert,* at ¶ 9, Dr. Hsu has not marshaled a separate equal protection argument under the state constitution. We therefore review his equal protection challenge under the strict-scrutiny and rational-basis framework, and because there is no suspect class or fundamental right involved, we apply the rational basis standard to his claim. *See Polk,* 449 A.2d at 17; *Grimm,* 635 A.2d at 462.

[¶ 31] The legislature has chosen the preponderance of evidence standard for physician discipline and this Court, the governing body for attorneys, has chosen the clear and convincing standard for attorney discipline. The separation of powers between the legislature and this Court forms a rational basis for the different standards. *See Polk,* 449 A.2d at 18; *Grimm,* 635 A.2d at 462; *Gandhi,* 483 N.W.2d at 300. In addition, a lawyer representing a client in a legal action is often cast in an adversarial role in which one party to the action necessarily prevails and the other party to the action necessarily does not prevail. Although not a common event, on occasion the lawyer for the losing party is the subject of a complaint to the attorney disciplinary system. The higher standard of proof for attorney discipline weeds out unwarranted complaints by unhappy litigants. *See Grimm,* 635 A.2d at 462 (a higher standard of proof for attorneys can be justified by the role they play in a process where there is always a losing party and may be necessary to weed out frivolous claims). The physician, on the other hand, is not engaged in an adversarial relationship on behalf of the patient and there is not a necessary loser resulting from the physician-patient relationship.

[¶ 32] Moreover, we also agree with the following rationale from *Gandhi,* at 300–01:

> Regarding physicians, the state is concerned with the direct and immediate

threat to physical health, safety and welfare. The consequences of incompetent or unprofessional care or treatment may be highly injurious, and even fatal. Redress in the courts may bring monetary relief, but it will do nothing to restore a person's health or life. Incompetent or unprofessional conduct by attorneys, however, is not so "final." As the trial court pointed out, the interests most often adversely affected by attorney misconduct can be compensated for by money damages or, in the case of personal interests, a court-ordered change in the situation temporarily affected by deprivation. We hold that a less stringent burden of proof for medical licensees than that of the legal profession is more protective of society's interest in individual life and health and is therefore not irrational.

[¶ 33] We conclude the use of the preponderance of evidence standard for medical disciplinary actions does not violate equal protection.

### B

[¶ 34] Dr. Hsu argues the Board's investigator, Dr. Lambrecht, had a personal and financial conflict of interest in this case, and the district court erred in deciding Dr. Lambrecht's participation did not violate due process. Dr. Hsu argues Dr. Lambrecht had a personal conflict, because Dr. Lambrecht's mother was denied a job with the National Guard in 1985 after complaints by Dr. Hsu. Dr. Hsu also argues Dr. Lambrecht had a financial conflict of interest, because Dr. Lambrecht is a doctor for Medcenter One in Bismarck, which would financially benefit if individuals in Elgin switched from Dr. Hsu's Elgin clinic to Medcenter One's Elgin clinic. Dr. Hsu argues that physicians subject to discipline by the Board have a due process right not to be investigated by an investigator who has a personal or financial conflict of interest.

[¶ 35] Under N.D.C.C. § 43–17–07.2, a member of the Board may not participate in the making of any decision or the taking of any action affecting the member's personal, professional, or pecuniary interest. However, the statutory scheme for investigative panels of the Board provides for two five-member investigative panels consisting of four physician members of the Board and one public member of the Board. N.D.C.C. § 43–17.1–02(1). The Board president assigns cases for investigation to each investigative panel. N.D.C.C. § 43–17.1–02(4). Section 43–17.1–05, N.D.C.C., authorizes an investigative panel to conduct necessary investigations and, if appropriate, to issue formal complaints. Under N.D.C.C. § 43–17.1–05(2), board members who have served on an investigative panel for a complaint may not participate in any proceeding before the Board relating to that complaint. We have held that a party in an administrative proceeding is not denied due process merely because the administrative agency performs all three functions of investigation, prosecution, and adjudication. *E.g. Saakian*, 1998 ND 227, ¶ 21, 587 N.W.2d 166.

[¶ 36] Here, the statutory scheme for the Board and its investigative panels precludes Board members like Dr. Lambrecht who have served on an investigative panel from participating in adjudicatory proceedings before the Board on that complaint. We reject Dr. Hsu's claim that "a biased investigator could spin the facts and probably convince a medical board to sanction any doctor." In our view, the statutory scheme for the Board's investigative panels, coupled with the other statutory procedures for adjudication by the Board, provide adequate procedural safeguards to satisfy the requirements for due process.

We conclude Dr. Lambrecht's participation in the investigation of these complaints did not violate due process. We therefore conclude the district court did not err in deciding the Board did not violate Dr. Hsu's due process or equal protection rights.

## IV

[¶ 37] In its appeal, the Board argues the district court erred in deciding the Board failed to comply with N.D.C.C. § 28–32–39(3) by delaying its ruling on the 2003 complaint. The Board argues the district court erred in reversing the Board's order revoking Dr. Hsu's medical license and erred in issuing a writ of mandamus compelling the Board to adopt the ALJ's recommended sanction of monitoring.

[¶ 38] Section 28–32–39(3), N.D.C.C., provides:

> If the agency head, or another person authorized by the agency head or by law to issue a final order, is not presiding, then the person presiding shall issue recommended findings of fact and conclusions of law and a recommended order within thirty days after the evidence has been received, briefs filed, and arguments closed, or as soon thereafter as possible. *The recommended findings of fact and conclusions of law and the recommended order become final unless specifically amended or rejected by the agency head.* The agency head may adopt the recommended findings of fact and conclusions of law and the recommended order as final. The agency may allow petitions for review of a recommended order and may allow oral argument pending issuance of a final order. An administrative agency may adopt rules regarding the review of recommended orders and other procedures for issuance of a final order by the agency.

> If a recommended order is issued, the agency must serve a copy of any final order issued and the findings of fact and conclusions of law on which it is based upon all the parties to the proceeding within sixty days after the evidence has been received, briefs filed, and arguments closed, or as soon thereafter as possible, in the manner allowed for service under the North Dakota Rules of Civil Procedure.

[Emphasis added].

[¶ 39] The ALJ issued his recommended decision on the 2003 complaint in November 2003. According to the Board's executive secretary, he advised Dr. Hsu the Board would consider that recommended decision during a teleconference on December 29, 2003, and Dr. Hsu instead asked to personally appear before the Board at its scheduled March 19, 2004, meeting. Meanwhile, Investigative Panel B of the Board thereafter issued a March 19, 2004, complaint against Dr. Hsu, realleging the claims in the 2003 complaint and three additional claims of inappropriate care. At the Board's March 19, 2004, meeting and before considering the ALJ's recommendation on the allegations in the 2003 complaint, the Board summarily suspended Dr. Hsu's license. *See* N.D.C.C. § 43–17–32.1. Dr. Hsu did not appeal that decision. *See Bland v. Commission on Med. Competency,* 557 N.W.2d 379, 383 (N.D.1996) (holding temporary suspensions were not final orders under N.D.C.C. ch. 28–32, but were appealable under N.D.C.C. § 43–17–32.1). The Board then considered the ALJ's recommendations on the allegations in the 2003 complaint and unanimously adopted the ALJ's recommended findings of fact and conclusions of law that Dr. Hsu had engaged in a continued pattern of inappropriate care and documentation for the seven patients identified in that complaint. However, a motion

to revoke Dr. Hsu's license failed and a motion to adopt the ALJ's recommended sanction failed for lack of a second. The Board then unanimously voted to delay disposition on the ALJ's recommended sanction for the 2003 complaint until after the hearing on the March 19, 2004, complaint.

[¶ 40] Under the plain language of N.D.C.C. § 28–32–39(3), the ALJ's recommended order "bec[a]me final unless specifically amended or rejected" by the Board. The Board should have specifically amended or rejected the ALJ's November 2003 recommended disposition of the 2003 complaint. Here, however, Dr. Hsu does not dispute that he requested a continuance to personally appear before the Board at its March 19, 2004, meeting. At that meeting, the Board instituted proceedings on the March 19, 2004 complaint, which incorporated the seven allegations of inappropriate care and inappropriate documentation from the 2003 complaint, plus three additional claims of inappropriate care, and then delayed disposition on the ALJ's recommended sanction for the 2003 complaint. The delay in the adoption of an order in the 2003 case was effectively superseded by the 2004 action and the Board's temporary suspension of Dr. Hsu's license continued until completion of the 2004 case. Our statutes do not preclude the Board from temporarily suspending Dr. Hsu's license and initiating a new proceeding that incorporated the allegations from the 2003 complaint. Moreover, our statutes do not require the Board to operate in a vacuum regarding the prior complaint. See In Interest of R.M.B., 402 N.W.2d 912, 917 (N.D.1987) (In parental termination proceedings where termination hearing is a culmination of prior proceeding, juvenile court need not operate in a vacuum regarding result of the prior proceeding). Under these circumstances, we decline to conclude that the Board's action in delaying disposition on the 2003 complaint precluded the Board from considering the cumulative effect of the conduct from that complaint in the proceedings on the 2004 complaint, including the determination of an appropriate sanction.

[¶ 41] Here, the Board found the 2004 complaint involved one instance of inappropriate care of one patient. The Board specifically rejected the ALJ's statement that Dr. Hsu's treatment of that patient "was not far from the mark." The Board found the evidence did not show Dr. Hsu's treatment of the other two patients was inappropriate or substandard, but that Dr. Hsu failed to appropriately document his care of those two patients. The Board decided revocation was the appropriate sanction after identifying four reasons for departing from the ALJ's recommended sanction.

[¶ 42] The legislature has vested the Board with authority to discipline physicians. N.D.C.C. §§ 43–17–30.1 and 43–17–31. Generally, the determination of the appropriate sanction to be imposed by the Board is a matter of discretion. Larsen, 1998 ND 193, ¶¶ 32, 35, 585 N.W.2d 801; Sletten, 448 N.W.2d at 611. In technical matters involving agency expertise, an agency decision is entitled to appreciable deference. Singha, 1998 ND 42, ¶ 14, 574 N.W.2d 838. The determination of a physician's standard of care and the requirements for appropriate documentation of that care involve technical matters. The Board is comprised mostly of practicing physicians, and the Board's determination is entitled to appreciable deference. Moreover, it is not a court's function to act as a super board when reviewing decisions by an administrative

agency, *see Singha,* at ¶ 14, and courts do not reweigh the evidence or substitute their judgment for a duly authorized agency. *Huff,* 2004 ND 225, ¶ 8, 690 N.W.2d 221.

[¶ 43] The Board's explanation for departing from the ALJ's recommended sanction, which we have previously quoted in this opinion, detailed four reasons for departing from the ALJ's recommended sanction and provided an adequate explanation for the Board's departure from the ALJ's recommended sanction. *See Jones,* 2005 ND 22, ¶¶ 23–24, 691 N.W.2d 251 (remanding to allow Board to explain reasons for rejecting ALJ's recommended sanction in case where no explanation had been provided). The Board was entitled to rely on the cumulative effect of the two disciplinary proceedings and the Board's expertise in deciding that Dr. Hsu's conduct reflected a serious departure from the appropriate standard of care. There is evidence in this record which supports the Board's determination, and we decline to reweigh the evidence or substitute our judgment for that of the Board. In deciding whether to monitor Dr. Hsu, the Board also was entitled to evaluate his prior behavior and his attitude and to rely on its collective perceptions of his amenability to monitoring. There is evidence in this record which supports a determination that Dr. Hsu's prior behavior, his attitude, and the probable logistics for supervision rendered the ALJ's recommendation for monitoring unworkable. Again, we do not act as a super board or reweigh those determinations and, contrary to Dr. Hsu's claim, this is not a case where the Board's decision runs so counter to the facts, the law, the ALJ's decision, and the district court's decision so as to lead to a conclusion that the Board's decision was based on personal animus rather than merit.

[¶ 44] The Board's sanction is authorized by law, and on this record and under our deferential standard of review, we hold the Board did not abuse its discretion in deciding to revoke Dr. Hsu's license. We therefore conclude the district court erred in reversing the Board's order revoking Dr. Hsu's license. Because we sustain the Board's sanction, we conclude Dr. Hsu has not demonstrated a clear legal right to the ALJ's recommended sanction, and we further conclude the district court abused its discretion in issuing a writ of mandamus compelling the Board to adopt the ALJ's recommended sanction for monitoring. *See Eichhorn v. Waldo Twnshp,* 2006 ND 214, ¶ 19, 723 N.W.2d 112 (recognizing petitioner for writ of mandamus must demonstrate clear legal right to the act sought to be compelled and no other plain, speedy, and adequate remedy in the ordinary cause of law and stating mandamus may not be issued to compel an official's discretionary acts).

[¶ 45] We therefore reverse the part of the district court's judgment reversing the Board's order revoking Dr. Hsu's license, and we reverse the court's order issuing a writ of mandamus. We affirm the district court judgment to the extent the court rejected Dr. Hsu's due process and equal protection challenges. Because we conclude the district court erred in deciding in favor of Dr. Hsu, we further conclude Dr. Hsu is not entitled to attorney's fees under N.D.C.C § 28–32–50 and we reverse the court's award of attorney's fees.

V

[¶ 46] We affirm the judgment in part and reverse in part, and we reverse the writ of mandamus and remand with instructions to reinstate the Board's decision.

[¶ 47] LAWRENCE A. LECLERC, S.J., and ALLAN L. SCHMALENBERGER, D.J., and DALE V. SANDSTROM, and DANIEL J. CROTHERS, JJ., concur.

[¶ 48] The Honorable LAWRENCE A. LECLERC, S.J., and the Honorable ALLAN L. SCHMALENBERGER, D.J., sitting in place of MARING, J., and KAPSNER, J., disqualified.